UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN McCABE,<br><br>                  *Plaintiff*,<br><br>      -against-<br><br>CVS HEALTH CORPORATION<br>and CVS PHARMACY, INC.,<br><br>           *Defendants*. | 1:22-cv-03116-RPK-RML<br><br>**Oral Argument is Requested** |


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO
RULES 9(b) AND 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**


TODD C. BANK,
 ATTORNEY AT LAW, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York  11415
(718) 520-7125
By Todd C. Bank

*Counsel to Plaintiff*


**Date of Service: November 4, 2022**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATUTES AND RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.     CVS Uses Customer 'Donations' to Pay Down CVS's Debt . . . . . . . . . . . . . . . 1

     B.     Under a Last-Minute Amendment to the CSA, it Appears that
CVS is Not Required to Give, to the ADA, any Money that
is Raised from Customers in Excess of $10,000,000 . . . . . . . . . . . . . . . . . . . . . 3

     C.     CVS's Press Release Announcing the Campaign Implies that
CVS Would Use its Own Money, not that of its Customers,
to Honor CVS's "$10,000,000 Commitment" . . . . . . . . . . . . . . . . . . . . . . . . . 4

     D.     CVS Falsely Represents that Campaign Donations are Tax-Deductible . . . . . . . . 4

     E.     Plaintiff is a Victim of CVS's Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.     DEFENDANTS DENY THE INDISPUTABLE LEGAL EFFECTS
OF THEIR $10 MILLION DOLLAR CONTRACTUAL OBLIGATION . . . . . . . . . . 6

II.     IT APPEARS THAT DEFENDANTS ARE NOT OBLIGATED
TO GIVE, TO THE ADA, ANY MONEY THAT IS RAISED
FROM CUSTOMERS IN EXCESS OF $10,000,000 . . . . . . . . . . . . . . . . . . . . . . . . 8

III.     THE AMENDED COMPLAINT ALLEGES
A MATERIAL MISSTATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.     THE AMENDED COMPLAINT STATES
A CLAIM FOR FRAUD BY OMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.     THE AMENDED COMPLAINT PROPERLY ALLEGES SCIENTER . . . . . . . . . . . . 12

VI.     THE AMENDED COMPLAINT STATES
A CLAIM FOR BREACH OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Table of Contents (*cont'd*)**

VII.   DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE CLAIMS
       FOR VIOLATIONS OF CONSUMER-PROTECTION LAWS . . . . . . . . . . . . . . . . . . 15

MISCELLANY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.   The Press Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       B.   Tax-Deductibility of Campaign Donations  . . . . . . . . . . . . . . . . . . . . . . . . . 17

       C.   Lack of Filing the CSA in Massachusetts  . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

Page

**STATUTES AND RULES**

26 U.S.C. § 61(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

N.Y. GBL § 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**CASES**

*Abbas v. Foreign Policy Group, LLC*,
  783 F.3d 1328 (D.C. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*CIT Bank, N.A. v. Zisman*,
  No. 17-cv-02126, 2021 WL 3354047
  (E.D.N.Y. Mar. 1, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Doyle v. Mastercard Int'l Inc.*,
  700 F. Appx. 22 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

*Grumman Allied Industies, Inc. v. Rohr Industries, Inc.*,
  748 F.2d 729 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hatteras Enterprises, Inc. v. Forsythe Cosmetic Group, Ltd.*,
  No. 15-cv-5887, 2022 WL 3682270 (E.D.N.Y. Aug. 25, 2022) . . . . . . . . . . . . . . . . 12-13

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*McCabe v. ConAgra Foods, Inc.*,
  No. 16-cv-93, 2016 WL 8943310 (E.D.N.Y. Aug. 29, 2016),
  *aff'd*, 681 F. Appx. 82 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mylander v. C.I.R.*,
  No. 22283-12, 2014 WL 4636529
  (U.S. Tax Ct. Sept. 17, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8

**Table of Authorities; Cases (*cont'd*)**

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Sharpe v. A&W Concentrate Co.*,
No. 19-cv-768, 2021 WL 3721392
(E.D.N.Y. July 23, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sibbach v. Wilson & Co.*,
312 U.S. 1 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Yookel, Inc. v. United States Steel Corp.*,
No. 20-cv-4513, 2022 WL 542379 (E.D.N.Y. Feb. 23, 2022) . . . . . . . . . . . . . . . . . . . . 11-12

## INTRODUCTION

Plaintiff, Kevin McCabe ("McCabe"), submits this memorandum of law in opposition to the motion by Defendants, CVS Health Corporation and CVS Pharmacy, Inc. (collectively, "CVS"), for dismissal of the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## ALLEGATIONS

### A.    CVS Uses Customer 'Donations' to Pay Down CVS's Debt

On April 16, 2021, CVS entered into a contract with the American Diabetes Association ("ADA") titled "Corporate Sponsorship Agreement" (the "CSA" or "Agreement"). *See* Am. Compl., ¶ 21; CSA at 1 (a copy of the CSA is attached as Exhibit "A" to the Amended Complaint). The CSA, whose term is "from April 13, 2021 (the 'Effective Date'), through April 12, 2024," Am. Compl., ¶ 22, contains a section, which the Amended Complaint calls the "CSA Donation Section," *see id.*, ¶ 23, that requires CVS to "'offer opportunities to its customers to make a donation to the ADA.'" *Id.*, quoting Am. Compl., Exh "A" at 18. Accordingly, CVS conducted a fundraising campaign (the "Campaign") in November, 2021, in which, "prior to the completion of transactions at its nearly ten thousand retail stores . . ., CVS's customers ('Customers') were asked on the checkout screen . . . if they wished, as part of the checkout process, to make a donation (a 'Campaign Donation'), above and beyond the price of their purchase, to the ADA by tapping one of several boxes on the checkout screen, each of which contained a pre-selected amount, or to decline to make a Campaign Donation by tapping a box stating 'no' (the 'Checkout Message')." *Id.*, ¶ 13.

The CSA also states: that "'[CVS] commits to raise for the ADA a minimum of $10,000,000 for the Term of this Agreement,'" *Id.*, ¶ 23, quoting Am. Compl., Exh. "A" at 18; that, "'[i]n the event the total funds raised through in-store fundraising and cause marketing and donated to the ADA from the Effective Date through December 31, 2023 total less than $10,000,000, [CVS] agrees to

either (i) donate funds to the ADA equal to the difference in the funds donated and $10,000,000, or (ii) [CVS] may, in its sole discretion, elect to conduct additional consumer campaigns prior to April [xx], 2024,'" *id.*, quoting same; and, that, "'[s]hould a difference still remain due after the additional consumer campaigns, if any, are completed, [CVS] agrees to donate funds to the ADA equal to the difference between the total funds donated and $10,000,000.'" *Id.*, quoting same.

Although CVS was required to try to raise $10,000,000 by asking its Customers to make Campaign Donations, this requirement did not change the fact that "[a]ll Campaign Donations were *voluntary* in that they were *not based on any legal obligation* that Customers owed to the ADA, CVS, or any other person or entity." *Id.*, ¶ 31 (emphases added). Therefore, under the CSA, "CVS was the *only person or entity that was legally responsible* for the ADA's receiving of $10,000,000." *Id.*, ¶ 32 (emphasis added).

CVS's contractual promise that the ADA would receive $10,000,000, which the Amended Complaint calls the "CVS Guarantee," *see id.*, ¶ 24, "became legally binding upon CVS on the CSA's Effective Date," *id.*, and "constituted a debt of $10,000,000 from CVS to the ADA (the 'CVS Debt')," *id.*, ¶ 26, which was "required to be satisfied no later than April 30, 2024." *Id.*, ¶ 27. It follows that "CVS, when entering into the CSA, *necessarily* intended to use Campaign Donations toward the satisfaction of the CVS Debt to the extent that Campaign Donations reached $10,000,000," *id.*, ¶ 28 (emphasis added), and that CVS, "by definition, [*did*] use[] Campaign Donations toward the satisfaction of the CVS Debt to [that] extent." *Id.*, ¶ 29. Therefore: (i) "Customers who believed that they were making a Campaign Donation *necessarily* took the risk, which CVS imposed upon them, that the amount of their Campaign Donations would be received by the ADA *whether or not they made the Campaign Donation*, and this risk would be fully borne out if total Campaign Donations ('Total Campaign Donations') did not exceed $10 million," *id.*, ¶ 37 (emphases added); and (ii) "even if the entirety of the Total Campaign Donations were to *exceed* $10

2

million, the amount of money that Campaign Donations would *cause* the ADA to receive that the ADA would *not receive absent the Campaign Donations* is only the amount by which the Total Campaign Donations *exceeded* $10 million." *Id.*, ¶ 38 (emphases added).

**B.      Under a Last-Minute Amendment to the CSA, it Appears that CVS is Not Required to Give,  to the ADA, any Money that is Raised from Customers in Excess of $10,000,000**

The Amended Complaint alleges: that, "[o]n October 28, 2021, a document titled 'Amendment to Corporate Sponsorship Agreement' included a single amendment to the CSA (the 'CSA Amendment')," Am. Compl., ¶ 46 (a copy of the "Amendment to Corporate Sponsorship Agreement Amendment" is attached as Exhibit "B" to the Amended Complaint); that "[t]he CSA Amendment amended the CSA Donation Section's statement that '[a]ny amounts raised over $10,000,000 minimum will be donated to the ADA as well,'" *id.*, ¶ 47, quoting Am. Compl., Exh. "A" at 18; that the CSA Amendment states that, "'[e]ffective as of the Amendment Effective Date [(*i.e.*, October 28, 2021, *see* Am. Compl., Exh. 'B' at 1)], Attachment A to the [CSA] is hereby amended to include the following paragraph after the second paragraph of the section entitled "Sponsorship Fee & Payment,"'" *id.*, ¶ 48, quoting same; that the new paragraph states: "'[*CVS*] may direct any funds raised in *excess of $10,000,000* over the Term of the Agreement to support *other initiatives* at [*CVS*]'s discretion, *so long as such other initiatives advance the ADA's mission*. Such direction shall be provided in writing by [CVS] to the ADA and shall be subject to the approval of the ADA, such approval not to be unreasonably withheld,'" *id.*, quoting same (emphases added); that "[t]he use of Campaign Donations in a manner that is *approved by* the ADA is materially different than the giving of Campaign Donations *to* the ADA," *id.*, ¶ 49 (emphases added); and, that "[t]he Checkout Message was false, deceptive, and misleading because, even apart from CVS's using of Campaign Donations toward the satisfaction of the CVS Debt, CVS was not, in fact, committing to forward *any part of any Campaign Donations* to the ADA." *Id.*, ¶ 50 (emphasis added).

**C. CVS's Press Release Announcing the Campaign Implies that CVS Would Use its Own Money, not that of its Customers, to Honor CVS's "$10,000,000 Commitment"**

The Amended Complaint alleges that, "[f]urther reflecting CVS's bad faith and fraudulent intent is that, in a press release posted on CVS's website on November 2, 2021 . . . [(a copy of which is attached as Exhibit 'C' to the Amended Complaint)], CVS clearly implied that CVS's $10 million commitment was separate, apart, and independent of Campaign Donations." Am. Compl., ¶ 51 (para. "51" quotes the relevant portion of the press release, titled "CVS Health announces $10 million commitment to the American Diabetes Association to reach five million patients and transform health outcomes").

**D. CVS Falsely Represents that Campaign Donations are Tax-Deductible**

The Amended Complaint alleges that "[t]he portion of a Campaign Donation that was used toward the satisfaction of the CVS Debt was not tax-deductible," Am. Compl., ¶ 59, and that "[t]he portion of a Campaign Donation that is not received by the ADA but is instead used by CVS with the approval of the ADA was not tax-deductible." Id., ¶ 60.

The Amended Complaint further alleges: that "[r]eceipts given to Customers who made a Campaign Donation ('Campaign Donation Receipts') stated, in the itemization portion: 'ADA $[] DONATION' (the 'Receipt Itemization'), in which the '[]' contained the amount of the Campaign Donation," id., ¶ 55; that "Campaign Donation Receipts stated, at the bottom: '[t]hank you for supporting the next step for a cure and a future without diabetes. 100% of donations go to the American Diabetes Association. EIN 13-1623888. Keep this receipt for your tax records' (the 'Receipt Statement')," id., ¶ 56; that "Campaign Donation Receipts' statement that '100% of donations go to the American Diabetes Association' was false, deceptive, and misleading because the ADA received, as a result of a Campaign Donation, only that portion that was neither used toward the satisfaction of the CVS Debt nor by CVS with the approval of the ADA," id., ¶ 57; and that

"[t]he Receipt Statement clearly implied that Campaign Donations were tax-deductible." *Id.*, ¶ 58.

Because a Customer could not know whether his Campaign Donation will be used to pay down the CVS Debt or whether, if the CVS Debt had been fully paid, it will be used by CVS instead of given to the ADA, "a Customer who made a Campaign Donation could not know what, if any, portion of the Campaign Donation was tax-deductible." *Id.*, ¶ 61.

**E     Plaintiff is a Victim of CVS's Fraud**

The Amended Complaint alleges that, "[o]n November 15, 2021, McCabe, at [a] CVS store . . . [in] Staten Island, New York . . ., made a Campaign Donation because he believed, based upon the Checkout Message, and as confirmed by his Receipt Itemization and Receipt Statement, that the entirety of his Campaign Donation would go to the ADA, and that, absent his Campaign Donation, the ADA would receive no part of it," *id.*, ¶ 69, and that, "[i]f McCabe had known that at least a portion of his Campaign Donation would not be given to the ADA, he would have not made that portion of his Campaign Donation if possible, or would not have made his Campaign Donation at all." *Id.*, ¶ 70.

CVS's counsel, in a letter to the Court dated September 29, 2022 (Dkt. No. 14) stated: "'CVS Health confirms that the donations did not total $10 million and that all amounts raised in the Campaign were timely transmitted by CVS Health to the ADA, just as all amounts raised in the future will be so transmitted to the ADA.'" *Id.* at 3, quoting CVS's response, dated Sept. 15, 2022, to inquiry by the undersigned counsel. Thus, McCabe's Campaign Donation was used toward the payment of the CVS Debt.

# ARGUMENT

## POINT I

### DEFENDANTS DENY THE INDISPUTABLE LEGAL EFFECTS
### OF THEIR $10 MILLION DOLLAR CONTRACTUAL OBLIGATION

The fundamental premise of CVS's dismissal motion, which is not stated explicitly but is implied throughout CVS's memorandum of law, is that CVS is acting as a guarantor of its Customers because the CSA requires CVS to ask them to make donations to the ADA. However, CVS, in order for this to have been so, would have had to guarantee the legal debt of a third party (here, the Customers), but, because Campaign Donations were voluntary, no such debt existed, and CVS's portrayal therefore fails as a matter of both fact and law.

CVS contends that, "to the extent the [CSA] can be interpreted to contain an obligation by CVS to 'donate' to the ADA as part of the Campaign, it is a *conditional* obligation that only arises on a date in the future under limited (and manifestly unlikely) circumstances," Def. Mem. at 11 (emphasis added; footnote omitted), and that, therefore, McCabe lacks a claim for fraud because "a misrepresentation as to a future event that may or may not occur, can form no basis of actionable fraud." *Id.* (citation and quotation marks omitted). However, CVS incurred the CVS Debt *as soon as the CSA took effect* and was required to satisfy it by April 30, 2024. *See* Am. Compl., ¶ 27. Whether CVS satisfies the CVS Debt with its own money or the money of its Customers, *the CVS Debt itself belonged to CVS, not to its Customers*. Thus, whether CVS actually ends up having to pay the ADA a portion of the CVS Debt is irrelevant. Likewise, nothing about the nature of the CVS Debt is changed by CVS's description of the CSA as providing that "CVS's principal financial responsibility in the Campaign is to fundraise, *not* to donate," Def. Mem. at 9 (emphasis by CVS), nor by the fact that, under the CSA, "CVS agreed to '*raise* . . . a minimum of $10,000,000 for the Term of this Agreement' by 'offer[ing] opportunities to its customers to make a donation to the

ADA.'" *Id.* at 7, quoting Am. Compl., Exh. "A" at 18 (emphasis by CVS; footnote omitted).

CVS describes "the [CSA] [as] expressly permit[ting] – and indeed requir[ing] – that CVS's *conditional promise be reduced by all amounts donated by its customers*," Def. Mem. at 9 (emphasis added), but this description is simply an admission of the existence of the CVS Debt.

If "A" enters into a contract with "B" in which "A" promises that, by a certain date, "B" will receive a certain amount of money (the "Guaranteed Amount"), and that "A" will try to get "C" to pay the Guaranteed Amount, or "commits to raising" the money from "C" by "offer[ing] opportunities to 'C' to pay 'B,'" but that "A" will pay "C" the difference between the Guaranteed Amount and any lesser amount that "C" pays, then "A," upon the contract's taking effect, has a debt to "B" of the Guaranteed Amount. This is plainly undeniable. It is also plainly undeniable that, to the extent that "C" pays the Guaranteed Amount, the debt of "A" is reduced by the same extent.

The notion that the lack of payment by "C" is "a condition precedent that must be satisfied before any . . . obligation [by 'A' to pay] would arise," Def. Mem. at 7, misses the point. First, a debt is a debt whether it is due currently or must be satisfied on a future date. Second, a debt is no less a debt where someone other than the debtor will be asked, but is not obligated, to pay it. Thus, CVS's expectations, if any, regarding the amount of money that its Customers would voluntarily 'donate' does not change the critical fact that CVS, upon the CSA's taking effect, incurred the CVS Debt, and that, therefore, Campaign Donations paid it down.

Just as "A" is not a guarantor of "C," CVS is not a guarantor of its Customers, for: "[a] guaranty creates a secondary obligation under which the guarantor promises to be responsible for the *debt* of another. The guarantor is only secondarily liable in the event the *debtor* does not perform the *primary obligation*," 38 Am. Jur. 2d, *Guaranty*, § 2 (2010) (emphases added). Like "B," CVS's Customers had no debt, a.k.a. a "primary obligation," when the CSA took effect. Indeed, a Customer Donation that paid down the CVS Debt is income to CVS, as "[d]ischarge of indebtedness is

specifically included as an item of gross income." *Mylander v. C.I.R.*, No. 22283-12, 2014 WL 4636529, *6 (U.S. Tax Ct. Sept. 17, 2014), citing 26 U.S.C. § 61(12).

CVS contends that "[t]he CVS pledge to cover a Potential Shortfall is contingent upon the occurrence of a future event, *i.e.*, the failure to reach $10 million in customer donations over a period of ending in 2024," Def. Mem. at 10, but that "[i]f that event does not occur, meaning there is no shortfall because customer donations reach $10 million or more, then CVS is not bound to make the promised contribution," *id.*, and that, "[c]onsequently, when CVS entered into the [CSA], it did not incur a 'CVS Debt.'" *Id.* This sleight-of-hand argument fails because, again, whether or not CVS ultimately has to make a payment to the ADA does not change the fact that CVS, upon the CSA's taking effect, incurred the CVS Debt, which is paid down by Customer Donations. If, in the above scenario, "C" ends up paying the Guaranteed Amount, "A" would not have to make a payment to "B," but this would not change the fact that, upon the taking effect of the agreement between "A" and "B," "A" had a debt to "B" of the Guaranteed Amount.

## POINT II

### IT APPEARS THAT DEFENDANTS ARE NOT OBLIGATED TO GIVE, TO THE ADA, ANY MONEY THAT IS RAISED FROM CUSTOMERS IN EXCESS OF $10,000,000

CVS notes that, "[c]iting [the CSA Amendment], Plaintiff alleges that 'CVS was no longer required to give *any* [donations over $10 million] to the ADA." Def. Mem. at 12, quoting Am. Compl., ¶ 1 (emphasis in Am. Compl.; last bracketed material is by CVS).

CVS challenges McCabe's reading of the CSA Amendment, because, first, "the [CSA] [A]mendment makes clear that except as expressly set forth therein, it 'shall not alter, modify, amend or in any way affect the terms, conditions, obligations, covenants or agreements contained in the [CSA], all of which are ratified and affirmed in all respects and shall continue in full force and effect,'" Def. Mem. at 12, quoting Am. Compl., Exh. "B" at 2, and, second, "Plaintiff concedes – as

he must – that '[t]he fact that the amendment *added to*, as opposed to having *replaced*, the language of the original [CSA] supports CVS's claim.'" *Id.*, quoting letter by Todd C. Bank to the Court dated September 30, 2022 (Dkt. No. 15) at 2 (emphases in the letter). CVS thus concludes that "[t]he [CSA], as amended, plainly requires that all donations be forwarded to the ADA." *Id.* However, the CSA Amendment, which states that "'[*CVS*] may direct any funds raised in *excess of $10,000,000* over the Term of the Agreement to support *other initiatives* at *[CVS]'s discretion*, *so long as such other initiatives advance the ADA's mission*[,] [and] [s]uch direction shall be provided in writing by [CVS] to the ADA and shall be subject to the approval of the ADA, such approval not to be unreasonably withheld,'" Am Compl., ¶ 48, quoting Am. Compl., Exh. "B" at 1 (emphases added), does not appear to require that CVS give, to the ADA, any money raised in excess of $10,000,000. First, the CSA mentions only two "initiatives" one of which is an ADA "initiative" and one of which is a CVS "initiative." The first is "PROJECT POWER KIDS (Year 1-3)[,] [which] is [an] *ADA* initiative . . . ." Am. Compl., Exh. "A" at 11 (emphasis added). The second "initiative" is "[*CVS*]'s Project Health initiative ('Project Health')," *id.* at 8 (emphasis added), which appears in the following:

> **Impact Statement**: [CVS] is proud to be the Project Power Strategic Partner to help empower vulnerable communities to better manage and prevent prediabetes. *[CVS] has pledged $10 million dollars* over three years to support people in their health journey of preventing and managing diabetes through increased awareness, knowledge, and taking actions to improve health and fund research to drive discovery and address the unmet needs leading to the future elimination of these disparities and the devasting impact on our communities. Together we will increase reach, engagement, and education for 5 million patients and caregivers to improve health outcomes.
>
> *ADA* channels will measure the following to achieve this number:
> - Reach (marketing/digital outreach): 3 million over three years
> - Engagement (someone taking action and completing risk test): 1.5 million over three years
> - Education/Impact: 20,000 over three years

> [CVS] channels will measure to achieve this number:
> - Engagement (glucose screenings via [CVS]'s Project Health *initiative* ("Project Health")) 25 Markets plus 4 Mobile RV units estimate 600-700 per year or over 3 years the screening of over 2,000 patients.
> - Reach (engagement with ADA resources and link) 1.2 million over the next 3 years.

*Id.* (emphases added). CVS's position, *i.e.*, that the phrase "so long as such *other initiatives* advance the ADA's mission" applies *only to ADA initiatives*, conflicts with the CSA's use of the word "initiative," which includes ADA *and* CVS "initiatives." Furthermore, CVS's position is peculiar because, insofar as it relies on the notion that the word "initiative" applies only to the ADA, one might wonder what "initiative" of the ADA would *not* "advance the ADA's mission." In any event, because the term "initiative," as used in the CSA, includes "initiatives" of *both* the ADA and CVS, the CSA Amendment appears to permit CVS to direct Campaign Donations, by the extent to which total Campaign Donations exceed $10 million, to *CVS* initiatives. Thus, although CVS is correct that, as McCabe acknowledged, the amendment *adds to*, rather than, *replaces*, the CSA Donation Section, it is hardly obvious, and, indeed, seems doubtful, that "[t]he agreement, as amended, plainly requires that all donations be forwarded to the ADA," Def. Mem. at 12, and only discovery might reveal the parties' understanding.

CVS further contends that, because "the Amended Complaint does not allege that the [CSA] [A]mendment has been triggered," *id.*, "Plaintiff seeks relief for alleged harm that has not occurred." *Id.* at 13. On the contrary, McCabe's allegations, if true, would mean that he and other Customers were falsely told that their 'donations' were guaranteed to go to the ADA, *i.e.*, in accordance with the commonsense understanding of a 'donation,' which is that the beneficiary would receive money that it would otherwise not receive, as opposed to the ADA's receiving of "only that portion of [a Campaign Donation] that [is] neither used toward the satisfaction of the *CVS Debt* nor *by CVS* with the approval of the ADA." Am. Compl., ¶ 57 (emphases added) (as noted in Allegations (V), *supra*,

McCabe's Campaign Donation was used toward the payment of the CVS Debt).

## POINT III

### THE AMENDED COMPLAINT ALLEGES A MATERIAL MISSTATEMENT

CVS contends that "Plaintiff's [fraud] claim is . . . grounded [only] in a theory of fraud by omission." Def. Mem. at 14. However, the Amended Complaint alleges that "[t]he Checkout Message had only one reasonable understanding: that CVS was merely collecting Campaign Donations and forwarding them to the ADA," Am. Compl., ¶ 16, but that "[t]he Checkout Message was false, deceptive, and misleading because CVS was *not* merely collecting Campaign Donations and forwarding them to the ADA, but was, in fact, using Campaign Donations *toward the satisfaction of the CVS Debt*," *id.*, ¶ 33 (emphases added), and because the result of the CSA Amendment is that, "even *apart* from CVS's using of Campaign Donations toward the satisfaction of the CVS Debt, CVS was not, in fact, committing to forward any part of *any* Campaign Donations to the ADA." *Id.*, ¶ 50 (emphases added).

## POINT IV

### THE AMENDED COMPLAINT STATES A CLAIM FOR FRAUD BY OMISSION

CVS contends that McCabe fails to state a claim for fraud by omission because "the Amended Complaint nowhere alleges a fiduciary or confidential relationship between the parties, or any other facts that would give rise to a duty to disclose," Def. Mem. at 15, and that "Plaintiff has alleged nothing more than an ordinary arms-length business relationship[,] [and] [t]his does not suffice." *Id.* However, whereas "[a]n omission can only serve as the basis of a fraudulent inducement claim where a defendant has a duty to disclose," *Yookel, Inc. v. United States Steel Corp.*, No. 20-cv-4513, 2022 WL 542379, *8 (E.D.N.Y. Feb. 23, 2022) (citation and quotation marks omitted), "[i]t is well established that, *absent* a fiduciary relationship between the parties, a duty to disclose arises only under the special[-]facts doctrine where *one party's superior knowledge of essential facts renders*

*a transaction without disclosure inherently unfair.*" *Id.* (emphases added; citation and quotation marks omitted).

With respect to the question of the duty of disclosure, it is indisputable: (i) that, as between CVS and its Customers, only CVS knew that Campaign Donations were used to satisfy the CVS Debt, and only CVS knew that, under the CSA Amendment, Campaigns Donations, to the extent that total Campaign Donations exceed $10 million, would not have to be given to the ADA (*i.e.*, under McCabe's reading of the CSA Amendment); and (ii) that it is inherently unfair of CVS to request, without informing its customers of those facts, that its Customers make a 'donation' to the ADA. Indeed, one of the cases that CVS cites, *i.e.*, *Grumman Allied Industies, Inc. v. Rohr Industies, Inc.*, 748 F.2d 729 (2d Cir. 1984), which CVS describes as "holding an 'ordinary arms-length business relationship' did not give rise to a duty to disclose and dismissing fraudulent concealment claim on summary judgment," Def. Mem. at 16, quoting *Grumman Allied*, 748 F.2d at 739, states that, "under New York law, a duty to disclose material facts is triggered: first, where the parties enjoy a *fiduciary* relationship ... and second, *where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge*." *Grumman Allied*, 748 F.2d at 738-739 (emphases added; citation and quotation marks omitted).

## POINT V

## THE AMENDED COMPLAINT PROPERLY ALLEGES SCIENTER

CVS notes that "Rule (b) [of the Federal Rules of Civil Procedure] permits a plaintiff to allege scienter generally, but the Second Circuit has 'repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent.'" Def. Mem. at 11 (citation and quotation marks omitted). As recently noted, "[t]he requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Hatteras Enterprises, Inc. v. Forsythe Cosmetic Group, Ltd.*, No. 15-cv-5887, 2022 WL 3682270, *11 (E.D.N.Y. Aug. 25, 2022) (citations and quotation marks omitted). Each of these prongs is clearly present. First, CVS's motive to mislead Customers was, as set forth in Point III, *supra*, to cause them to believe that "CVS was merely collecting Campaign Donations and forwarding them to the ADA," Am. Compl., ¶ 16, thereby inducing them to make 'donations' and thus pay down the CVS Debt; and, as CVS acknowledges, "[i]ndeed, the more that customers donate during the Campaign, the greater the likelihood that the ultimate amount raised will exceed the $10 million floor," Def. Mem. at 8, n.6, a plain fact of which CVS was obviously aware. Second, because "[t]he use of Campaign Donations in a manner that is approved by the ADA is materially different than the giving of Campaign Donations to the ADA," Am. Compl., ¶ 49, CVS would benefit by having more flexibility over how to use Campaign Donations. Third, CVS's opportunities clearly existed because CVS determined what to disclose, *i.e.*, the content of the Checkout Message, and what not to disclose.

**POINT VI**

**THE AMENDED COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT**

CVS contends that "Plaintiff asserts a nationwide breach of contract claim without alleging the existence, terms, or parties to the contract that was allegedly breached." Def. Mem. at 16. Obviously, this is untrue. *See* Am. Compl., ¶¶ 13-16, 29, 46-50. Furthermore, CVS's reliance upon *Doyle v. Mastercard Int'l Inc.*, 700 F. Appx. 22 (2d Cir. 2017), *see* Def. Mem. at 16, fails. There, the plaintiff alleged that the defendant "had advertised . . . that it would donate one cent to a charitable program . . . for each Mastercard credit or debit card transaction of at least $10 in a United States restaurant," *Doyle*, 700 F. Appx. at 23, that "the advertisements disclosed that the promotion would start on a certain date and run until the earlier of: (1) a specified end date; or (2) whenever Mastercard reached its $4 million maximum donation," *id.*, and that these terms "formed a contract

with [the defendant], and that [the defendant] breached [that contract] by continuing to advertise the . . . promotion after it became apparent that the $4 million maximum donation would be, or had been, met." *Id.* at 23-24. The court upheld the dismissal of the action, reasoning that, "regardless of when the advertisements appeared or how certain [the defendant] was that the maximum donation would be met, there was no breach of contract." *Id.* at 24. In the present case, the breach-of-contract claim does not depend upon the likelihood that Campaign Donations will reach $10 million nor upon the actual reaching of $10 million. In short, and as reflected by CVS's cursory addressing of *Doyle*, *see* Def. Mem. at 16, *Doyle* does not support CVS.

CVS also cites *McCabe v. ConAgra Foods, Inc.*, No. 16-cv-93, 2016 WL 8943310 (E.D.N.Y. Aug. 29, 2016), *aff'd*, 681 F. Appx. 82 (2d Cir. 2017), *see* Def. Mem. at 2, n.2, but, CVS, instead of even purporting to explain why this case is relevant, much less why it supports dismissal in the *present* action, states that "[t]his is not the first time Plaintiff – represented by the same counsel – has filed a class action complaint alleging unfounded contractual obligations and consumer protection violations relating to a charitable campaign," Def. Mem. at 2, n.2, and that "on August 29, 2016, Judge Allyne R. Ross of the Eastern District of New York issued a decision dismissing Plaintiff's amended class action complaint against ConAgra Foods, Inc. for failure to state a claim, which was subsequently affirmed by the Second Circuit." *Id.* In other words, CVS cites *ConAgra Foods* solely to bias this Court against McCabe and the undersigned counsel. Such an attempt to sway the Court is obviously improper. Similarly, CVS contends that "this case exemplifies the maxim that no good deed goes unpunished." Def. Mem. at 1. In any event, it is clear that CVS entered into the CSA in order to gain sales through its relationship with the ADA, as shown by a highlighted version of the CSA (a copy of which is annexed as Exhibit "A" to the Affirmation of Todd C. Bank).

## POINT VII

## DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE
## CLAIMS FOR VIOLATIONS OF CONSUMER-PROTECTION LAWS

CVS contends that McCabe fails to state a claim under New York General Business Law

Section 349, because that statute "requires a finding that a reasonable consumer in like circumstances

would consider the misrepresentation material." Def. Mem. at 18 (citation and quotation marks

omitted). However, for the reasons set forth in Points I through IV, *supra*, CVS's misrepresentations

were indisputably material. Likewise, CVS's contention that the New York and non-New York

consumer-protection claims fail to state a claim because "Plaintiff has failed to allege any . . . conduct

that is either deceptive, misleading, unfair or unconscionable . . ., or *any* other improper conduct, and

certainly not with the heightened pleading standard required by Rule 9(b)," *id.* at 19, 22 (emphasis

by CVS), is erroneous for the same reasons.

CVS's contention that "[s]everal of Plaintiff's consumer fraud claims should be dismissed

because Plaintiff is statutorily barred from pursuing class action suits under the relevant state

statutes," Def. Mem. at 22, is erroneous, because state-law prohibitions against class actions are

inapplicable in federal court. *See Sharpe v. A&W Concentrate Co.*, No. 19-cv-768, 2021 WL

3721392, *10 (E.D.N.Y. July 23, 2021), citing *Shady Grove Orthopedic Associates, P.A. v. Allstate

Ins. Co.*, 559 U.S. 393 (2010). As recently explained:

> Writing for himself [in *Shady Grove*] in a separate concurrence . . .,
> Justice Stevens wrote that "[a] federal rule ... cannot govern a
> particular case in which the rule would displace a state law that is
> procedural in the ordinary use of the term but is so intertwined with
> a state right or remedy that it functions to define the scope of the
> state-created right." [*Shady Grove*, 559 U.S.] at 423 (Stevens, J.,
> concurring in part). . . . Just last year, however, in *La Liberte v. Reid*,
> 966 F.3d 79 (2d Cir. 2020), the Second Circuit addressed *Shady
> Grove* and *did not identify Justice Stevens's concurrence as the
> precedential holding.* Instead, in considering whether a state law
> special-dismissal provision was displaced by Federal Rules 12 and 56,
> the Second Circuit wrote that "[t]he test is *whether a Federal Rule of*

> Civil Procedure answers the same question as the [state law]. If so, the Federal Rule governs, unless it violates the Rules Enabling Act." *La Liberte*, 966 F.3d at 87 (internal alterations and quotations omitted). The *La Liberte* court *neither discussed Justice Stevens's concurrence nor assessed whether the state law was "substantive" in determining whether the federal rules at issue would apply*. Rather, and *as did Justice Scalia's plurality, the Second Circuit held that the test is "whether a rule really regulates procedure,--the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." Id.* at 88 (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)). The court also favorably cited *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015), in which then-judge Kavanaugh held that the test articulated in *Sibbach*, 312 U.S. at 14—*i.e.*, whether the rule really regulates procedure—and *not Justice Stevens's concurrence in Shady Grove, controls the analysis. Abbas*, 783 F.3d at 1337.

*CIT Bank, N.A. v. Zisman*, No. 17-cv-02126, 2021 WL 3354047, *4 (E.D.N.Y. Mar. 1, 2021) (emphases added).

Because Rule 23 of the Federal Rules of Civil Procedure "provides [an] answer . . . . [by] creat[ing] a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action," *Shady Grove*, 559 U.S. at 398, Rule 23 applies. *See id.* at 398-402.

## MISCELLANY

### A.    The Press Release

CVS's response to the Amended Complaint's allegation that, "[f]urther reflecting CVS's bad faith and fraudulent intent is that, in a press release posted on CVS's website on November 2, 2021, . . . CVS clearly implied that CVS's $10 million commitment was separate, apart, and independent of Campaign Donations," Am. Compl., ¶ 51, is "[n]ot so," Def. Mem. at 13 (footnote omitted), because, according to CVS, "the press release states that CVS had pledged $10 million to the ADA over three years, and that CVS would host an in-store fundraising campaign to give customers an opportunity to support the ADA." *Id.* at 13, n.10. This, of course, is pure obfuscation, as it does not address McCabe's allegation, which, moreover, is indisputably true. *See* Am. Compl., ¶ 51 (quoting

the press release).

## B.     Tax-Deductibility of Campaign Donations

CVS maintains that Campaign Donations are tax-deductible because "there is no CVS Debt, and all the customer donations were paid to the ADA," Def. Mem. at 13, and because "the [CSA] does not permit CVS to retain any portion of the donations." *Id.* However, Customers could not know whether their Campaign Donations are tax-deductible. Because the CVS Debt arose on the CSA's Effective Date and Campaign Donations pay it down, a Customer could not know whether his Campaign Donation will be used to pay down the CVS Debt and therefore could not know whether it is tax-deductible. Likewise, with respect to McCabe's reading of the CSA Amendment, a Customer, who could not know in any event if Total Campaign Donations had reached $10,000,000, also could not know whether, if that amount had been reached, his Campaign Donation will be used by CVS instead of given to the ADA.

## C.     Lack of Filing the CSA in Massachusetts

CVS contends that "Plaintiff alleges that the [CSA] should have been publicly filed by the nonparty ADA in Massachusetts." Def. Mem. at 13, citing Am. Compl., ¶¶ 62-68, and that "CVS had no such filing obligation and, indeed, the Amended Complaint concedes that the law 'applies only to the ADA, *i.e.*, not to CVS.'" *Id.*, quoting Am. Compl., ¶ 66. However, as that paragraph alleges, "[a]lthough Mass. Gen. Laws ch. 68 § *19* [(emphasis added)] applies only to the ADA, *i.e.*, not to CVS, Mass. Gen. Laws ch. 68 § *22(a)* [(emphasis added)] states that "*[e]very contract or agreement between . . . a professional solicitor and a charitable organization required to have a certificate of registration . . .* shall be . . . *filed with the director* of the division within ten days after such contract or agreement is entered into. *No solicitation shall be conducted prior to the filing of such contract or agreement*." Am. Compl., ¶ 66 (emphases in original). Thus, Section 22(a) did not require any *particular* party to file the CSA, but simply conditioned CVS's operating of the Campaign in

Massachusetts upon its being filed. Because the Agreement was not filed, CVS did not lawfully operate the Campaign in Massachusetts.

## CONCLUSION

Plaintiff respectfully requests that the Court: (i) deny Defendants' motion; and (ii) grant, to Plaintiff, any relief deemed just and proper.

Dated: November 4, 2022

Respectfully submitted,

  s/ *Todd C. Bank*
TODD C. BANK,
  ATTORNEY AT LAW, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York  11415
(718) 520-7125
By Todd C. Bank

*Counsel to Plaintiff*
