UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1:22-cv-03116-RPK-RML

KEVIN McCABE,

*Plaintiff*,

-against-

CVS HEALTH CORPORATION
and CVS PHARMACY, INC.,

*Defendant*s.

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT
TO RULES 9(b) AND 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

TODD C. BANK,
 ATTORNEY AT LAW, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York  11415
(718) 520-7125
By Todd C. Bank

*Counsel to Plaintiff*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATUTES AND RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      PLAINTIFF DOES NOT ALLEGE THAT THE MISREP-
        RESENTATION WAS ITSELF PLAINTIFF'S INJURY . . . . . . . . . . . . . . . . . . . . . . 1

III.    LEAVE TO REPLEAD SHOULD BE GRANTED IN
        THE EVENT, AND TO THE EXTENT, THAT THE
        COURT WERE TO GRANT DEFENDANTS' MOTION . . . . . . . . . . . . . . . . . . . . . 3

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# TABLE OF AUTHORITIES

**Page**

**STATUTES AND RULES**

Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

N.Y. GBL § 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2


**CASES**

*Bai v. Zhuo,*
No. 13-cv-05790, 2014 WL 2645119
(E.D.N.Y. June 13, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bildstein v. MasterCard Int'l Inc.,*
329 F. Supp. 2d 410 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Browne v. Lyft, Inc.,*
194 N.Y.S.3d 85 (N.Y. App. Div. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

*Chen v. 2425 Broadway Chao Restaurant, LLC,*
No. 16-cv-5735, 2017 WL 2600051
(S.D.N.Y. June 15, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cortec Industries, Inc. v. Sum Holding L.P.,*
949 F.2d 42 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hayden v. County of Nassau,*
180 F.3d 42 (2d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Jackson-Mau v. Walgreen Co.,*
No. 18-cv-4868, --- F. Supp. 3d ---,
2023 WL 366913 (E.D.N.Y. Jan. 24, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2, 2

*MacNaughton v. Young Living Essential Oils, LC,*
67 F.4th 89 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Milanese v. Rust-Oleum Corp.,*
244 F.3d 104 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Patrella v. County of Suffolk,*
No. 18-cv-3722, 2019 WL 6525650
(E.D.N.Y. Dec. 3, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

**Table of Authorities; Cases (*cont'd*)**

*Small v. Lorillard Tobacco Co., Inc.*,
 94 N.Y.2d 43 (N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Sutter v. Dibello*,
 No. 18-cv-817, 2019 WL 4195303
 (E.D.N.Y. Aug. 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Zanfardino v. City of New York*,
 230 F. Supp. 3d 325 (S.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**INTRODUCTION**

Plaintiff, Kevin McCabe ("McCabe"), submits this supplemental memorandum of law pursuant to the Order of the Court dated September 12, 2023.

**ARGUMENT**

**POINT I**

**PLAINTIFF DOES NOT ALLEGE THAT THE
MISREPRESENTATION WAS ITSELF PLAINTIFF'S INJURY**

In *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43 (N.Y. 1999), the plaintiffs asserted claims for, *inter alia*, fraud and violation of New York General Business Law ("GBL") Section 349 based upon the "alleg[ation] that defendants used deceptive commercial practices to sell their cigarettes to New Yorkers and that they would not have bought these cigarettes had they known that nicotine is an addictive drug." *Id.* at 51. However, the court rejected the notion that "consumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have suffered an injury under General Business Law § 349," *id.* at 56, explaining that, "[t]heir theory contains no manifestation of either pecuniary or 'actual' harm; plaintiffs do not allege that the cost of cigarettes was affected by the alleged misrepresentation, nor do they seek recovery for injury to their health as a result of their ensuing addiction." *Id.* Furthermore, the court found that "[t]he flaw in plaintiffs' statutory claim foretells the inadequacy of the common-law claims: an act of deception, entirely independent or separate from any injury, is not sufficient to state a cause of action under a theory of fraudulent concealment" *Id.* at 57.

Instead of "'deception [being] both act and injury,'" *Jackson-Mau v. Walgreen Co.*, No. 18-cv-4868, --- F. Supp. 3d ---, 2023 WL 366913, *7 (E.D.N.Y. Jan. 24, 2023), quoting *Small*, 94 N.Y.2d at 56, "[t]o establish causation, the plaintiff must show that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) *and* that the

misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Browne v. Lyft, Inc.*, 194 N.Y.S.3d 85, 88-89 (N.Y. App. Div. 2023) (emphasis added; citation and quotation marks omitted).

McCabe alleges that, "[i]f McCabe had known that at least a portion of his Campaign Donation would not be given to the ADA, he would have not made that portion of his Campaign Donation if possible, or would not have made his Campaign Donation at all.." Am. Compl. (Dkt. No. 13), ¶ 70. This paragraph includes the injury that McCabe sustained, *i.e.*, that "at least a portion of his Campaign Donation [was] not . . . given to the ADA." Additional allegations further support his claim of injury:

> Para. 1: "CVS used donations to reimburse itself for its own debt to the ADA";
>
> Para. 4: "CVS defrauded its customers; that is, those customers who, in response to being requested by CVS, spent their own money on what they thought was a donation to the ADA but that, instead, went fully or partly to CVS";
>
> Para. 29: "CVS, by definition, used Campaign Donations toward the satisfaction of the CVS Debt to the extent that Campaign Donations reached $10,000,000"; and
>
> Para.33: "CVS . . . was, in fact, using Campaign Donations toward the satisfaction of the CVS Debt."

As the Second Circuit recently reiterated, "[i]njury is adequately alleged under GBL §[] 349 . . . by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate representations." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023) (citation and quotation marks omitted). Put differently, "[a] § 349 claim cannot stand if the consumer alleges that he *received the services he paid for* without alleging any separate resulting injury," *Jackson-Mau*, 2023 WL 366913 at *7 (E.D.N.Y. Jan. 24, 2023) (emphasis added; citation and quotation marks omitted)); *see also Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 416

(S.D.N.Y. 2004) (finding no injury where the plaintiff did not allege that the defendant "failed to deliver the service [that the plaintiff] paid for by using credit card abroad, but only that its use incurred an undisclosed transaction fee (quotation marks omitted)).

McCabe alleges that, as a result of CVS's misrepresentation, he did not receive what he paid for; that is, he paid to have his "donation" meaningfully go to the ADA, but part or all of it did not (to be sure, *none* of McCabe's "donation" meaningfully went to the ADA. *See* Def. Letter dated Sept. 20, 2022 (Dkt. No. 14) at 3 ("[p]rior to filing the amended complaint, plaintiff's counsel wrote to us to ask whether the fundraising Campaign in November 2021 raised in excess of $10 million" . . . . 'CVS Health confirm[ed] that the donations did not total $10 million . . . .'").

## III.    LEAVE TO REPLEAD SHOULD BE GRANTED IN THE EVENT, AND TO THE EXTENT, THAT THE COURT WERE TO GRANT DEFENDANTS' MOTION

McCabe's proposed second amended complaint (a copy of which is annexed hereto as Exhibit "A") alleges that, "McCabe was injured because, as a result of CVS's misrepresentation, at least a portion of his Campaign Donation was not meaningfully given to the ADA, such that he did not receive that for which he had paid." Exh. "A," ¶ 72. This allegation clearly asserts an injury *caused by* CVS's misrepresentation, as opposed to asserting that the misrepresentation is *itself* the injury. Accordingly, leave to replead should be granted in the event of a dismissal.

Even where a plaintiff does not request permission for leave to replead in the event of a dismissal, courts grant it. *See, e.g.*, *Patrella v. County of Suffolk*, No. 18-cv-3722, 2019 WL 6525650 (E.D.N.Y. Dec. 3, 2019):

> Although [the] [p]laintiff has not requested leave to replead, the Second Circuit has stated that "[w]hen a motion to dismiss is granted, the *usual practice* is to grant leave to amend the complaint." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *see also* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Leave to amend should be granted *unless* there is evidence of undue delay, bad faith, undue prejudice, or

futility. *See Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).

*Id.* at *6.

CVS's critiques of Bank's allegations make it clear that amending the Amended Complaint in response to some or all of those critiques would not be futile; that is, it cannot be assumed that "[b]etter pleading [c]ould not cure th[e] [supposed] defect[s] in [Bank's] claims." *Id.* (citation and quotation marks omitted). *See also Sutter v. Dibello*, No. 18-cv-817, 2019 WL 4195303, *13 (E.D.N.Y. Aug. 12, 2019) ("'[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead. Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion,'" quoting *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)); *Bai v. Zhuo*, No. 13-cv-05790, 2014 WL 2645119, *4 (E.D.N.Y. June 13, 2014) ("[t]he Court dismisses [the plaintiff]'s *amended complaint* without prejudice to the filing of a second amended complaint. When a complaint is dismissed, 'the usual practice is to grant leave to amend the complaint,'" quoting *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir.1999)); *Chen v. 2425 Broadway Chao Restaurant, LLC*, No. 16-cv-5735, 2017 WL 2600051, *9 (S.D.N.Y. June 15, 2017) ("[a]lthough [the] [p]laintiffs have *already amended their complaint* in response to [the defendant]'s first motion to dismiss, they have *not yet had an opportunity to do so in response to an opinion of the Court*. Accordingly, the Court cannot conclude that allowing [the] [p]laintiffs to amend once again would be futile."); *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 339 (S.D.N.Y. 2017) ("[the] [p]laintiff has already amended his complaint twice. Nevertheless, in this circuit, '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead,'" quoting *Cortec Industries*, 949 F.2d at 48).

**<u>CONCLUSION</u>**

Plaintiff respectfully requests that the Court: (i) deny Defendants' motion; (ii) grant Plaintiff leave to replead in the event, and to the extent, that the Court were to grant defendants' motion (iii) grant, to Plaintiff, any further relief deemed just and proper.

Dated: September 20, 2023

Respectfully submitted,

__*s/ Todd C. Bank*_____

TODD C. BANK,
  ATTORNEY AT LAW, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York  11415
(718) 520-7125
By Todd C. Bank

*Counsel to Plaintiff*

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KEVIN McCABE,

                                  *Plaintiff*,

        -against-

CVS HEALTH CORPORATION and
CVS PHARMACY, INC.,

                                  *Defendants*.

1:22-cv-03116-RPK-RML

## SECOND AMENDED COMPLAINT

## INTRODUCTION

1.      In November, 2021, CVS Health Corporation and one of its wholly-owned subsidiaries, CVS Pharmacy, Inc. (collectively, "CVS"), asked CVS's customers to make donations to the American Diabetes Association (the "ADA"). However, the fundraiser not what CVS made it seem. CVS told its customers that all of their donations would go to the ADA, but, instead, CVS used donations to reimburse itself for its own debt to the ADA, which was in the amount of $10,000,000. One might be forgiven for thinking that any money raised from customers *beyond* $10,000,000 would go to the ADA, and, indeed, CVS, initially, had explicitly agreed with the ADA that this would be the case. However, less than a week before the fundraiser was to begin, the agreement to give that money to the ADA was not only eliminated, but CVS was no longer required to give any of it to the ADA.

2.      In short, CVS concluded millions of transactions by asking its customers to donate to the ADA even though CVS had seen to it that it would not have to give a single cent from those donations to the ADA.

3.      CVS went out of its way to ensure that its customers would remain in the dark with respect to the dirty truths of the Campaign:

1

- CVS implied that the CVS's $10 million debt would be paid with CVS's own money, not the money that its customers thought they were donating;

- CVS issued a press release that falsely implied that CVS's $10 million debt was separate, apart, and independent of customer donations, and this same press release, which CVS issued after agreeing with the ADA that CVS would not have to give the ADA *any* money that customers donated in excess of $10 million, clearly indicated that the *entirety* of each customer donations would go to the ADA;

- The receipts that CVS gave to those customers who made (that is, who thought they made) donations stated that their entire donations would go to the ADA, which CVS knew was false;

- Contrary to the clear implications, on the receipts that CVS gave to those customers who made (that is, who thought they made) donations, that the donations were entirely tax-deductible, the donations were not tax-deductible at all;

- CVS violated a Massachusetts law by operating the fundraiser in that state without filing, with the state's attorney general's office, a copy of the fundraising agreement and amendment, which the attorney general's office would then have posted online for the public to access.

4.     In sum, CVS defrauded its customers; that is, those customers who, in response to being requested by CVS, spent their own money on what they thought was a donation to the ADA but that, instead, went fully or partly to CVS.

5.     One might be forgiven for thinking that CVS would proudly announce the results of its campaign, but CVS, as part of its policy of non-transparency, keeps those results a secret.

6.    Plaintiff, Kevin McCabe ("McCabe"), resides in the Eastern District of New York and is a citizen of the State of New York.

7.    Defendant, CVS Health Corporation, is a corporation organized and existing under the laws of Delaware, and maintains its principal place of business at One CVS Drive, Woonsocket, Rhode Island  02895.

8.    Defendant, CVS Pharmacy, Inc., is a corporation organized and existing under the laws of Rhode Island, and maintains its principal place of business at One CVS Drive, Woonsocket, Rhode Island  02895.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction under 28 U.S.C. Section 1332(d)(2)(A).

10.   The matter in controversy would exceed an aggregated sum or value of $5,000,000, exclusive of interest and costs, if the putative class (described below) were certified.

11.   Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(2).

12.   At least two thirds of the members of the putative class are not citizens of the State of New York.

## FACTS

I.    **The In-Store Fundraising Campaign**

13.   From November 2, 2021, through November 27, 2021, CVS conducted a fundraising campaign (the "Campaign") in which, prior to the completion of transactions at its nearly ten thousand retail stores in the 50 States and the District of Columbia, CVS's customers ("Customers") were asked on the checkout screen (also known as the pin pad) if they wished, as part of the checkout process, to make a donation (a "Campaign Donation"), above and beyond the price of their purchase, to the ADA by tapping one of several boxes on the checkout screen, each of which contained a pre-

3

selected amount, or to decline to make a Campaign Donation by tapping a box stating "no" (the "Checkout Message").

14.     The ADA is a non-profit corporation organized and existing under the laws of Ohio, and maintains its principal place of business in Arlington, Virginia.

15.     The Checkout Message was the only term of the Campaign that CVS provided to Customers.

16.     The Checkout Message had only one reasonable understanding: that CVS was merely collecting the Campaign Donations and forwarding them to the ADA.

17.     The Checkout Message was a material aspect of the Campaign.

18.     CVS knew that the Checkout Message a material aspect of the Campaign.

19.     CVS intended that Customers would rely upon the Checkout Message in deciding whether to make a Campaign Donation.

20.     Customers had no reason to believe that the Checkout Message was anything but true and accurate.

## II.     CVS Uses Customer "Donations" to Pay Down CVS's $10,000,000 Debt

21.     CVS executed the Campaign pursuant to an agreement between CVS and the ADA titled "Corporate Sponsorship Agreement" ("CSA") (a copy of the CSA is attached as Exhibit "A" hereto).

22.     The CSA deems its validity to exist from April 13, 2021 (the "CSA's Effective Date"), through April 12, 2024.

23.     The CSA includes the following section (the "CSA Donation Section"):

> Company [(*i.e.*, CVS, both here and in each other quotation of "Company" from the CSA herein)] will offer opportunities to its customers to make a donation to the ADA. Company commits to raise for the ADA a minimum of $10,000,000 for the Term of this Agreement. The Company agrees to make annual payments of funds

raised during each calendar year of this Agreement by December 31, beginning in 2021, as set forth below.

In the event the total funds raised through in-store fundraising and cause marketing and donated to the ADA from the Effective Date through December 31, 2023 total less than $10,000,000, Company agrees to either (i) donate funds to the ADA equal to the difference in the funds donated and $10,000,000, or (ii) Company may, in its sole discretion, elect to conduct additional consumer campaigns prior to April [xx], 2024. Should a difference still remain due after the additional consumer campaigns, if any, are completed, Company agrees to donate funds to the ADA equal to the difference between the total funds donated and $10,000,000. Any amounts raised over $10,000,000 minimum will be donated to the ADA as well.

**Payment Due:** December 31, 2021: Funds raised during 2021 consumer campaign
**Payment Due:** December 31, 2022: Funds raised during 2022 consumer campaign
**Payment Due:** December 31, 2023: Funds raised during 2023 consumer campaign.
**Final Payment Due:** April 30, 2024: Funds raised from any additional consumer campaigns plus, in the event that the total funds raised is less than $10,000,000, an amount equal to the difference between the total funds raised and $10,000,000.

Exh. "A" at 18 (bolding in original).

24.     The CSA Donation Section's statement that "Company agrees to donate funds to the ADA equal to the difference between the total funds donated and $10,000,000" (the "CVS Guarantee") became legally binding upon CVS on the CSA's Effective Date.

25.     "Attachment A" to the CSA, titled "Acknowledgement of Support" (original in all caps), states: "Company has pledged $10 million dollars over three years." Exh. "A" at 8.

26.     The CVS Guarantee constituted a debt of $10,000,000 from CVS to the ADA (the "CVS Debt").

27.     Under the CSA Donation Section, the CVS Debt was required to be satisfied no later than April 30, 2024.

28.     CVS, when entering into the CSA, necessarily intended to use Campaign Donations

toward the satisfaction of the CVS Debt to the extent that Campaign Donations reached $10,000,000.

29. CVS, by definition, used Campaign Donations toward the satisfaction of the CVS Debt to the extent that Campaign Donations reached $10,000,000.

30. Under the CSA Donation Section, CVS was obligated to try to satisfy the CVS Debt through Campaign Donations.

31. All Campaign Donations were voluntary in that they were not based on any legal obligation that Customers owed to the ADA, CVS, or any other person or entity.

32. Under the CSA Donation Section, CVS was the only person or entity that was legally responsible for the ADA's receiving of $10,000,000.

33. The Checkout Message was false, deceptive, and misleading because CVS was not merely collecting Campaign Donations and forwarding them to the ADA, but was, in fact, using Campaign Donations toward the satisfaction of the CVS Debt.

34. CVS's using of Campaign Donations toward the satisfaction of the CVS Debt is a material aspect of the Campaign because, whether or not a Customer made a Campaign Donation, the ADA would receive at least $10 million.

35. CVS knew that the Checkout Message was false, deceptive, and misleading.

36. CVS foresaw that Customers would rely upon the Checkout Message because the Checkout Message was material and was the only disclosure that CVS made to Customers regarding the Campaign.

37. CVS intended that Customers would rely upon the Checkout Message because such reliance increased the likelihood that the Customer would make a Campaign Donation.

38. The counting of Campaign Donations toward the satisfaction of the CVS Debt is a material aspect of the Campaign because Customers who believed that they were making a Campaign Donation necessarily took the risk, which CVS imposed upon them, that the amount of their

6

Campaign Donations would be received by the ADA whether or not they made the Campaign Donation, and this risk would be borne out if total Campaign Donations ("Total Campaign Donations") did not exceed $10 million.

39.     The counting of Campaign Donations toward the satisfaction of the CVS Debt is a material aspect of the Campaign because, even if the entirety of the Total Campaign Donations were to exceed $10 million, the amount of money that Campaign Donations would cause the ADA to receive that the ADA would not receive absent the Campaign Donations is only the amount by which the Total Campaign Donations exceeded $10 million.

40.     If, for example, Total Campaign Donations were $15 million, then $5 million is the portion of that $15 million that the Total Campaign Donations would have actually caused the ADA to receive.

41.     If, for example, Total Campaign Donations are $40 million, then $30 million is the portion of that $40 million that the Total Campaign Donations would have actually caused the ADA to receive.

42.     The fact that Campaign Donations were counted toward the satisfaction of the CVS Debt should have been disclosed to Customers because Customers, knowing of this fact and thus the fact that the ADA would receive at least $10 million whether or not they made a Campaign Donation, would be less likely to make a Campaign Donation than if they did not have such knowledge.

43.     The ability of a person to make a Campaign Donation is valuable because of the emotional satisfaction that making a Campaign Donation provides.

44.     The ability of a person to make a Campaign Donation is valuable because it is a convenient way to make a donation to the ADA.

45.     The ability of a person to make a Campaign Donation is valuable to the donor because it should have been tax-deductible.

46. CVS's enabling of Customers to make Campaign Donations is valuable to CVS because it provides CVS with goodwill from Customers.

### III. CVS Makes a Last-Minute Change So that, Even if its Customers Pay Down CVS's $10,000,000 Debt, CVS Would Still Not be Required to Give Any of its Customers' Money to the ADA

47. On October 28, 2021, a document titled "Amendment to Corporate Sponsorship Agreement" included a single amendment to the CSA (the "CSA Amendment") (a copy of the CSA Amendment is attached as Exhibit "B" hereto).

48. The CSA Amendment amended the CSA Donation Section's statement that "[a]ny amounts raised over $10,000,000 minimum will be donated to the ADA as well."

49. The CSA Amendment stated:

> Effective as of the Amendment Effective Date, Attachment A to the Agreement is hereby amended to include the following paragraph after the second paragraph of the section entitled "Sponsorship Fee & Payment":
>
> "The Company may direct any funds raised in excess of $10,000,000 over the Term of the Agreement to support other initiatives at the Company's discretion, so long as such other initiatives advance the ADA's mission. Such direction shall be provided in writing by the Company to the ADA and shall be subject to the approval of the ADA, such approval not to be unreasonably withheld."

Exh. "B" at 1.

50. The use of donations in a manner that is approved by the ADA is materially different than the making of donations to the ADA.

51. The Checkout Message was false, deceptive, and misleading because, even aside from CVS's using of Campaign Donations toward the satisfaction of the CVS Debt, CVS was not, in fact, committing to forward the entirety of Campaign Donations to the ADA.

**IV.**    **CVS's Press Release Announcing the Fundraiser Implies that CVS, not its Customers, Would Pay CVS's $10,000,000 Debt**

52.     Further reflecting CVS's bad faith and fraudulent intent is that, in a press release posted on CVS's website on November 2, 2021, titled "CVS Health announces $10 million commitment to the American Diabetes Association to reach five million patients and transform health outcomes" (the "CVS Press Release," a copy of which is attached as Exhibit "C" hereto), CVS clearly implied that CVS's $10 million commitment was separate, apart, and independent of Campaign Donations by stating the following:

> CVS Health (NYSE: CVS) today announced a new partnership with the American Diabetes Association® (ADA) to support families in helping to prevent and manage diabetes, as well as fund research on the devastating health disparities that fuel the diabetes epidemic. *CVS Health has committed $10 million over three years to support people in preventing and managing diabetes with increased awareness, knowledge, and action to improve health through Project Power.* The ADA's Project Power program aims to break down barriers that limit access to vital resources and empower participants to effectively prevent and manage diabetes.
>
> In addition, support will fund research to better understand and address the unmet needs in underserved communities leading to the future elimination of these disparities. *CVS Health will **also** host an in-store fundraising campaign at all CVS Pharmacy locations nationwide during American Diabetes Month, now through November 27, to give customers an opportunity to support the ADA and build a future without diabetes.*

Exh. "C" at 1 (emphases added).

53.     "CVS Health (NYSE: CVS)" is CVS Health Corporation.

54.     The CVS Press Release clearly represented that CVS Health Corporation was operating the Campaign.

**V.**    **CVS Falsely Represents that Campaign Donations are Tax-Deductible**

55.     Further reflecting CVS's bad faith and fraudulent intent is that, as set forth in paragraphs "56" through "62" herein, CVS issued false, deceptive, and misleading receipts to

Customers who made a Campaign Donation.

56.     Receipts given to Customers who made a Campaign Donation ("Campaign Donation Receipts") stated, in the itemization portion: "ADA $[] DONATION" (the "Receipt Itemization") in which the "[]" contained the amount of the Campaign Donation.

57.     Campaign Donation Receipts stated, at the bottom: "[t]hank you for supporting the next step for a cure and a future without diabetes. 100% of donations go to the American Diabetes Association. EIN 13-1623888. Keep this receipt for your tax records" (the "Receipt Statement").

58.     Campaign Donation Receipts' statement that "100% of donations go to the American Diabetes Association" was false, deceptive, and misleading because the ADA received, as a result of a Campaign Donation, only that portion that was neither used toward the satisfaction of the CVS Debt nor by CVS with the approval of the ADA.

59.     The Receipt Statement clearly implied that Campaign Donations were tax-deductible.

60.      The portion of a Campaign Donation that was used toward the satisfaction of the CVS Debt was not tax-deductible.

61.      The portion of a Campaign Donation that is not received by the ADA but is instead used by CVS with the approval of the ADA is not tax-deductible.

62.     As a result of the preceding two paragraphs, a Customer who made a Campaign Donation could not know what, if any, portion of the Campaign Donation was tax-deductible.

**VI.     CVS was Required to Publicly Disclose the CSA
          and the CSA Amendment, but Did Not So**

63.     Further reflecting CVS's bad faith and fraudulent intent is that, as set forth in paragraphs "64" through "69" herein, CVS executed the Campaign in Massachusetts without satisfying that state's requirement that the CSA and the CSA Amendment be disclosed.

64.     Under Mass. Gen. Laws ch. 68 § 18, CVS is a "professional solicitor," which that

provision defines as "any person who is retained for a *financial or other consideration* by a charitable organization to solicit in this commonwealth contributions for charitable purposes *directly* or in the form of payment for goods or services" (emphases added) (the same provision defines "person" as "any individual, organization, trust, foundation, group, association, partnership, corporation, society or any combination of them").

65. Under the CSA, CVS received consideration from the ADA as follows: "[t]he ADA agrees to identify and acknowledge Company as a supporter of the organization and the diabetes cause"; "[t]he ADA grants Company a non-exclusive, limited, revocable and conditional license during the term to use the ADA Marks, solely to identify Company as a supporter of the ADA," and CVS may use those marks "on and in conjunction with its product or brand" and "promotional materials"; "Company will be designated as the exclusive sponsor of the [ADA] Project Power Campaign in the national retail pharmacy category . . ., meaning that ADA . . . will not enter into a sponsor agreement of the [ADA] Project Power Campaign, with another company in this category without Company's prior written consent."

66. Mass. Gen. Laws ch. 68 § 19 states that "[e]very charitable organization . . . which intends to solicit contributions from persons within the commonwealth or have contributions solicited on its behalf by . . . professional solicitors shall, prior to any such solicitation, file an annual registration statement with the division [of public charities in the department of the attorney general] . . . [upon which] the director of the division shall issue a *certificate of registration* to a charitable organization within ten days of receipt of the registration statement. No charitable organization required to be registered under this section shall solicit funds without a valid certificate of registration" (emphasis added).

67. Although Mass. Gen. Laws ch. 68 § 19 applies only to the ADA, *i.e*, not to CVS, Mass. Gen. Laws ch. 68 § 22(a) states that **"***[e]very contract or agreement between . . . a*

*professional solicitor and a charitable organization required to have a certificate of registration .
. . shall be . . . filed with the director* of the division within ten days after such contract or agreement
is entered into. *No solicitation shall be conducted prior to the filing of such contract or agreement*"
(emphases added).

68. Because the CSA was required to have a certificate of registration and was therefore
required to be "filed with the director of the division" before the commencement of the Campaign in
Massachusetts, CVS, as a result of the lack of filing of the CSA, commenced, and continued to
execute, the Campaign in Massachusetts violation of that state's disclosure law.

69. The division of public charities in the department of the attorney general of
Massachusetts publicly posts, online, agreements between a professional solicitor and a charitable
organization required to have a certificate of registration. *See* masscharities.force.com/FilingSearch/s

## VII.    Plaintiff is a Victim of CVS's Fraud

70. On November 15, 2021, McCabe, at the CVS store located at 1933 Victory
Boulevard, Staten Island, New York 10314, made a Campaign Donation because he believed, based
upon the Checkout Message, and confirmed by his Receipt Itemization and Receipt Statement, that
the entirety of his Campaign Donation would go to the ADA, and that, absent his Campaign
Donation, the ADA would receive no part of it.

71. If McCabe had known that at least a portion of his Campaign Donation would not be
meaningfully given to the ADA, he would have not made that portion of his Campaign Donation if
possible, or would not have made his Campaign Donation at all.

72. McCabe was injured because, as a result of CVS's misrepresentation, at least a portion
of his Campaign Donation was not meaningfully given to the ADA, such that he did not receive that
for which he had paid.

## INTENTION TO REPRESENT A CLASS

73.     McCabe intends to seek the certification of a class (the "Putative Class") pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

74.     The Putative Class comprises McCabe and all other persons who made a Campaign Donation.

75.     There are thousands of other members of the Putative Class whose claims would be similar to McCabe's claims; and, furthermore, McCabe's claims are typical of those claims.

20.     The members of the Putative Class are so numerous that joinder of all of them is impracticable.

76.     McCabe would fairly and adequately protect the interests of the other members of the Putative Class. McCabe's interests would be, for purposes of this litigation, coincident with the interests of the other members of the Putative Class, and McCabe would have no interests that would be antagonistic to, or in conflict with, the other members of the Putative Class.

77.     A class action would be superior to all other available methods for the fair and efficient adjudication of this controversy. Because the Putative Class is so numerous that joinder of all of its members would be impracticable, and because the damages sustained by most of the individual members would be too small to render prosecution of the claims asserted herein economically feasible on an individual basis, the expense and burden of individual litigation would make it impractical for all of the members to adequately address the wrongs complained of herein. McCabe knows of no impediments to the effective management of this action as a class action.

78.     Common questions of law and fact predominate over questions that affect only individual Class Members. Among these questions are:

        (i) whether CVS Health Corporation wholly owns CVS Pharmacy, Inc.;

(ii) whether, from November 2, 2021, through November 27, 2021, CVS presented the Checkout Message to Customers during the checkout process;

(iii) whether the Checkout Message was the only term of the Campaign that CVS provided to Customers;

(iv) whether the Checkout Message had only one reasonable understanding: that CVS was merely collecting Campaign Donations and forwarding them to the ADA;

(v) whether the Checkout Message was a material aspect of the Campaign;

(vi) whether CVS knew that the Checkout Message a material aspect of the Campaign;

(vii) whether CVS intended that Customers would rely upon the Checkout Message in deciding whether to make a Campaign Donation;

(viii) whether Customers had any reason to believe that the Checkout Message was anything but true and accurate;

(ix) whether CVS executed the Campaign pursuant to the CSA;

(x) whether the term of the CSA is from April 13, 2021, through April 12, 2024;

(xi) whether the CSA stated that CVS "commits to raise [from Customers] for the ADA a minimum of $10,000,000 for the Term of this Agreement";

(xii) whether the CSA stated that CVS "agrees to donate funds to the ADA equal to the difference between the total funds donated and $10,000,000";

(xiii) whether the CSA stated that "[a]ny amounts raised over $10,000,000 minimum will be donated to the ADA as well";

(xiv) whether the CSA included an "Attachment A" titled "Acknowledgement of Support";

(xv) whether the Acknowledgement of Support stated that CVS "has pledged $10 dollars over three years" to the ADA;

(xvi) whether the CVS Guarantee was legally binding upon CVS;

(xvii) whether the CVS Guarantee became legally binding upon CVS on the CSA's Effective Date;

(xviii) whether the CVS Guarantee constituted a debt of $10,000,000 from CVS to the ADA;

(xix) whether, under the CSA Donation Section, the CVS Debt was required to be satisfied no later than April 30, 2024;

(xx) whether CVS, when entering into the CSA, intended to Campaign Donations toward the satisfaction of the CVS Debt;

(xxi) whether CVS used Campaign Donations toward the satisfaction of the CVS Debt;

(xxii) whether CVS was obligated by the CSA to try to satisfy the CVS Debt through Campaign Donations;

(xxiii) whether CVS's using of Campaign Donations toward the satisfaction of the CVS Debt is a material aspect of the Campaign;

(xxiv) whether Campaign Donations were voluntary in that they were not based on any legal debt that Customers owed to the ADA, CVS, or any other person or entity;

(xxv) whether CVS was the only person or entity that was legally responsible for the ADA's receiving of $10,000,000;

(xxvi) whether the Checkout Message was false, deceptive, and misleading;

(xxvii) whether CVS knew that the Checkout Message was false, deceptive, and misleading because CVS was not merely collecting Campaign Donations and forwarding them to the ADA, but was, in fact, using Campaign Donations toward the satisfaction of the CVS Debt;

(xxviii) whether CVS foresaw that Customers would rely upon the Checkout Message;

(xxix) whether CVS intended that Customers would rely upon the Checkout Message;

(xxx) whether Customers who believed that they were making a Campaign Donation necessarily took the risk, which CVS imposed upon them, that the amount of their Campaign Donations would be received by the ADA whether or not they make their Campaign

Donation;

(xxxi) whether, even if Total Campaign Donations were to exceed $10 million, the fungible nature of money means that the amount of money that Campaign Donations would cause the ADA to receive that the ADA would not have received absent the Campaign Donations is only the amount by which the Total Campaign Donations exceed $10 million;

(xxxii) whether the fact that Campaign Donations were counted toward the satisfaction of the CVS Debt should have been disclosed to Customers;

(xxxiii) whether the ability of a person to make a Campaign Donation is valuable because of the emotional satisfaction that making a Campaign Donation provides;

(xxxiv) whether the ability of a person to make a Campaign Donation is valuable because it is a convenient way to make a donation to the ADA;

(xxxv) whether the ability of a person to make a Campaign Donation is valuable to the donor because it is tax-deductible;

(xxxvi) whether CVS's enabling of Customers to make Campaign Donations is valuable to CVS because it provides CVS with goodwill from Customers;

(xxxvii) whether a document titled "Amendment to Corporate Sponsorship Agreement" (the "CSA Amendment") amended the CSA;

(xxxviii) whether the CSA Amendment was signed on October 28, 2021;

(xxxix) whether the CSA Amendment replaced the CSA's statement that "[a]ny amounts raised over $10,000,000 minimum will be donated to the ADA as well" with the following: "[CVS] may direct any funds raised in excess of $10,000,000 over the Term of the Agreement to support other initiatives at the [CVS]'s discretion, so long as such other initiatives advance the ADA's mission. Such direction shall be provided in writing by [CVS] to the ADA and shall be subject to the approval of the ADA, such approval not to be unreasonably withheld";

(xl) whether the use of donations by CVS in a manner that is approved by the ADA is materially different than the making of donations to the ADA;

(xli) whether the Checkout Message was false, deceptive, and misleading because, even apart from CVS's using of Campaign Donations toward the satisfaction of the CVS Debt, CVS was not, in fact, committing to forward the entirety of Campaign Donations to the ADA;

(xlii) whether, on November 2, 2021, CVS posted, on CVS's website, a press release titled "CVS Health announces $10 million commitment to the American Diabetes Association to reach five million patients and transform health outcomes";

(xliii) whether the CVS Press Release CVS implied that CVS's $10 million commitment to the ADA was separate, apart, and independent of Campaign Donations;

(xliv) whether the CVS Press Release represented that CVS Health Corporation was operating the Campaign;

(xlv) whether the CVS Press Release was issued after CVS agreed with the ADA that CVS would not have to give the ADA any money that customers donated in excess of $10 million;

(xlvi) whether the CVS Press Release indicated that all Campaign Donations would go to the ADA;

(xlvii) whether the Receipt Itemization of Campaign Donation Receipts stated "ADA $[] DONATION," in which the "[]" contained the amount of the Campaign Donation;

(xlviii) whether Campaign Donation Receipts stated, at the bottom: "[t]hank you for supporting the next step for a cure and a future without diabetes. 100% of donations go to the American Diabetes Association. EIN 13-1623888. Keep this receipt for your tax records";

(xlix) whether Campaign Donation Receipts' statement that "100% of donations go to the American Diabetes Association" was false, deceptive, and misleading because the ADA received, as a result of a Campaign Donation, only that portion that is neither used toward the satisfaction of the CVS Debt nor by CVS with the approval of the ADA;

(l) whether the Receipt Statement indicated that the entirety of a Campaign Donation was tax-deductible;

(li) whether the portion of a Campaign Donation that was used toward the satisfaction of the CVS Debt is tax-deductible;

(lii) whether the portion of a Campaign Donation that is not received by the ADA but is instead used by CVS with the approval of the ADA is tax-deductible;

(liii) whether CVS violated Massachusetts law by not filing the CSA and the CSA Amendgment with the division of public charities of that state's department of the attorney general;

(liv) whether CVS engaged in common-law fraud;

(lv) whether CVS engaged in breach of contract; and

(lvi) whether CVS violated the consumer-protection statutes that compose the Third Claim for Relief.

## CLAIMS FOR RELIEF

79.     McCabe incorporates, into each Claim for Relief, each and every allegation contained in paragraphs "1" through "28."

## FIRST CLAIM

### [Common-Law Fraud]

80.      CVS engaged in fraud under the common law of the 50 States and the District of Columbia.

81.     As a result of CVS's fraud, McCabe and the other members of the Putative Class are entitled to actual damages.

## SECOND CLAIM

### [Breach of Contract]

82.     CVS engaged in breach of contract under the common law of the 50 States and the District of Columbia.

83.     As a result of breaches of contract, McCabe and the other members of the Putative Class are entitled to actual damages.

## THIRD CLAIM

## [Violations of Consumer-Protection Laws]

## ALABAMA

## ALABAMA DECEPTIVE TRADE PRACTICES ACT

## (Ala. Code §§ 8-19-1 - 8-19-15)

84.     CVS violated the Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 - 8-19-15, with respect to persons who made Campaign Donations in Alabama (the "Putative Alabama Class Members"); specifically, CVS violated Ala. Code § 8-19-5(27).

85.     The Putative Alabama Class Members are entitled to statutory damages of $100 pursuant to Ala. Code § 8-19-10(a)(1).

86.     The Putative Alabama Class Members are entitled to reasonable legal fees pursuant to Ala. Code § 8-19-10(a)(3).

## ALASKA

## ALASKA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION ACT

## (Alaska Stat. §§ 45.50.471 - 45.50.561)

87.     CVS violated the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471 - 45.50.561, with respect to persons who made Campaign Donations in Alaska (the "Putative Alaska Class Members"); specifically, CVS violated Alaska Stat. § 45.50.471(b)(11).

88.     The Putative Alaska Class Members are entitled to statutory damages of $500 pursuant to Alaska Stat. § 45.50.531(a).

89.     The Putative Alaska Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Alaska Stat. § 45.50.535(a).

90.     The Putative Alaska Class Members are entitled to reasonable legal fees pursuant to

Alaska Stat. § 45.50.537(a).

## ARKANSAS

## ARKANSAS DECEPTIVE TRADE PRACTICES ACT

### (Ark. Code Ann. §§ 4-88-101 - 4-88-117)

91.     CVS violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101 - 4-88-117, with respect to persons who made Campaign Donations in Arkansas (the "Putative Arkansas Class Members"); specifically, CVS violated Ark. Code Ann. §§ 4-88-107(a)(10).

92.     The Putative Arkansas Class Members are entitled to actual damages pursuant to Ark. Code Ann. § 4-88-113(f)(1)(a).

93.     The Putative Arkansas Class Members are entitled to reasonable legal fees pursuant to Ark. Code Ann. § 4-88-113(f)(3).

## CALIFORNIA

## THE CALIFORNIA UNFAIR COMPETITION ACT

### (Calif. Bus & Prof. Code §§ 17200 - 17210)

94.     CVS violated the California Unfair Competition Act, Calif. Bus & Prof. Code §§ 17200 - 17210, with respect to persons who made Campaign Donations in California (the "Putative California Class Members"); specifically, CVS violated Calif. Bus & Prof. Code § 17200.

95.     The Putative California Class Members are entitled to actual damages against CVS pursuant to Calif. Bus & Prof. Code § 17203.

96.     The Putative California Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Calif. Bus & Prof. Code § 17203.

97.     The Putative California Class Members are entitled to reasonable legal fees pursuant to Calif. Code Civ. Proc. § 1021.5.

**THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**

**(Conn. Gen. Stat. §§ 42-110a - 42-110q)**

98.     CVS violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a - 42-110q, with respect to persons who made Campaign Donations in Connecticut (the "Putative Connecticut Class Members"); specifically, CVS violated Conn. Gen. Stat. §§ 42-110b(a).

99.     The Putative Connecticut Class Members are entitled to their actual damages pursuant to Conn. Gen. Stat. § 42-110g(a).

100.    The Putative Connecticut Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Conn. Gen. Stat. § 42-110g(d).

101.    The Putative Connecticut Class Members are entitled to reasonable legal fees pursuant to Conn. Gen. Stat. § 42-110g(d).

**DELAWARE**

**THE DELAWARE CONSUMER FRAUD ACT**

**(6 Del. Code §§ 2511 - 2528)**

102.    CVS violated the Delaware Consumer Fraud Act, 6 Del. Code §§ 2511 - 2528, with respect to persons who made Campaign Donations in Delaware (the "Putative Delaware Class Members"); specifically, CVS violated 6 Del. Code § 2513(a).

103.    The Putative Delaware Class Members are entitled to actual damages pursuant to Del. Code § 2525(a).

## DISTRICT OF COLUMBIA

## THE DISTRICT OF COLUMBIA CONSUMER
## PROTECTION PROCEDURES ACT

### (D.C. Code §§ 28-3901 - 3913)

104.     CVS violated the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901 - 3913, with respect to persons who made Campaign Donations in District of Columbia (the "Putative District of Columbia Class Members"); specifically, CVS violated D.C. Code §§ 28-3904(e) and (f).

105.     The Putative District of Columbia Class Members are entitled to statutory damages of $1,500 pursuant to D.C. Code § 28-3901(k)(2)(A)(i).

106.     The Putative District of Columbia Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to D.C. Code § 28-3901(k)(2)(D).

107.     The Putative District of Columbia Class Members are entitled to reasonable legal fees pursuant to D.C. Code § 28-3901(k)(2)(B).

## FLORIDA

## FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

### (Fla. Stat. §§ 501.201 - 501.213)

108.     CVS violated the Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. §§ 501.201 - 501.213, with respect to persons who made Campaign Donations in Florida (the "Putative Florida Class Members"); specifically, CVS violated Fla. Stat. § 501.204(1).

109.     The Putative Florida Class Members are entitled to actual damages pursuant to Fla. Stat. § 501.211(2).

110.     The Putative Florida Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Fla. Stat. § 501.211(1).

111.    The Putative Florida Class Members are entitled to reasonable legal fees pursuant to Fla. Stat. § 501.2105(1).

## GEORGIA

## GEORGIA FAIR BUSINESS PRACTICES ACT

### (Ga. Code Ann. §§ 10-1-390 - 10-1-408)

112.    CVS violated the Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-390 - 10-1-408, with respect to persons who made Campaign Donations in Georgia (the "Putative Georgia Class Members"); specifically, CVS violated Ga. Code Ann. §§ 10-1-393(a).

113.    The Putative Georgia Class Members are entitled to actual damages pursuant to Ga. Code. Ann. § 10-1-399(a).

114.    The Putative Georgia Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Ga. Code. Ann. § 10-1-399(a).

115.    The Putative Georgia Class Members are entitled to reasonable legal fees pursuant to Ga. Code. Ann. § 10-1-399(d).

## HAWAII

## PROHIBITION AGAINST UNFAIR AND
## DECEPTIVE ACTS OR PRACTICES

### (Haw. Rev. Stat. §§ 480-1 - 480-24)

116.    CVS violated Hawaii's prohibition against unfair and deceptive acts or practices, Haw. Rev. Stat. §§ 480-1 - 480-24, with respect to persons who made Campaign Donations in District of Columbia (the "Putative District of Columbia Class Members"); specifically, CVS violated Haw. Rev. Stat. § 480-2(a).

117.    The Putative Hawaii Class Members are entitled to statutory damages of $1,000 pursuant to Haw. Rev. Stat. § 480-13(b)(1).

118.    The Putative Hawaii Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Haw. Rev. Stat. § 480-13(b)(2).

119.    The Putative Hawaii Class Members are entitled to reasonable legal fees pursuant to Haw. Rev. Stat. § 480-13(b)(1).

## ILLINOIS

### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### (815 ILCS §§ 505/1 - 505/12)

120.    CVS violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1 - 505/1, with respect to persons who made Campaign Donations in Illinois (the "Putative Illinois Class Members"); specifically, CVS violated 815 ILCS 505/2.

121.    The Putative Illinois Class Members are entitled to actual damages pursuant to 815 ILCS 505/10a(a).

122.    The Putative Illinois Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to 815 ILCS 505/10a(c).

123.    The Putative Illinois Class Members are entitled to reasonable legal fees pursuant to 815 ILCS 505/10a(c).

## INDIANA

### INDIANA DECEPTIVE CONSUMER SALES ACT

### (Ind. Code Ann. §§ 24–5–0.5–0.1 - 24–5–0.5–12)

124.    CVS violated the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24–5–0.5–0.1 - 24–5–0.5–12, with respect to persons who made Campaign Donations in Indiana (the "Putative Indiana Class Members"); specifically, CVS violated Ind. Code Ann. § 24-5-0.5-3(a).

125.    The Putative Indiana Class Members are entitled to statutory damages of $500

pursuant to Ind. Code § 24-5-0.5-4(a).

126.    The Putative Indiana Class Members are entitled to reasonable legal fees pursuant to Ind. Code Ann. § 24-5-0.5-4(a).

## IOWA

### IOWA CONSUMER FRAUD ACT

### (Iowa Code Ann. §§ 714h.1 - 714h.8)

127.    CVS violated the Iowa Consumer Protection Act, Iowa Code Ann. §§ 714h.1 - 714h.8, with respect to persons who made Campaign Donations in Iowa (the "Putative Iowa Class Members"); specifically, CVS violated Iowa Code Ann. § 714h.3(1).

128.    The Putative Iowa Class Members are entitled to actual damages pursuant to Iowa Code Ann. § 714h.5(1)

129.    The Putative Iowa Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Iowa Code Ann. § 714h.5(1)

130.    The Putative Iowa Class Members are entitled to reasonable legal fees pursuant to to Iowa Code Ann. § 714h.5(2).

## KANSAS

### KANSAS CONSUMER PROTECTION ACT

### (Kan. Stat. Ann. §§ 50-623 - 50-643)

131.    CVS violated the Kansas Consumer Protection Act, Kan. Stat. Ann. §§ 50-623 - 50-643, with respect to persons who made Campaign Donations in Kansas (the "Putative Kansas Class Members"); specifically, CVS violated Kan. Stat. Ann. §§ 50-636(b)(2) and (3).

132.    The Putative Kansas Class Members are entitled to statutory damages of $10,000 pursuant to Kan. Stat. Ann. § 50-634(b).

133.    The Putative Kansas Class Members are entitled to an order enjoining CVS's unlawful

practices pursuant to Kan. Stat. Ann. § 50-634(a)(2).

134.    The Putative Kansas Class Members are entitled to reasonable legal fees pursuant to Kan. Stat. Ann. § 50-634(e)(1).

## LOUISIANA

### LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (La. Rev. Stat. §§ 51:1401 - 51:1430)

135.    CVS violated the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. §§ 51:1401 - 51:1430, with respect to persons who made Campaign Donations in Louisiana (the "Putative Louisiana Class Members"); specifically, CVS violated La. Rev. Stat. § 51:1405(A).

136.    The Putative Louisiana Class Members are entitled to actual damages pursuant to La. Rev. Stat. § 51:1409(A).

137.    The Putative Louisiana Class Members are entitled to reasonable legal fees pursuant to La. Rev. Stat. § 51:1409(A).

## MARYLAND

### MARYLAND CONSUMER PROTECTION ACT

### (Md. Code Com. Law §§ 13-101 - 13-501)

138.    CVS violated the Maryland Consumer Protection Act, Md. Code Com. Law §§ 13-101 - 13-501, with respect to persons who made Campaign Donations in Maryland (the "Putative Maryland Class Members"); specifically, CVS violated Md. Code Com. Law § 13-101(1), (3).

139.    The Putative Maryland Class Members are entitled to actual damages pursuant to Md. Code Com. Law §§ 13-408(a).

140.    The Putative Maryland Class Members are entitled to reasonable legal fees pursuant

to Md. Code Com. Law §§ 13-408(b).

## MASSACHUSETTS

## MASSACHUSETTS CONSUMER PROTECTION ACT

### (Mass. Gen. Laws Ch. 93a, §§ 1-11)

141. CVS violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93a, §§ 1-11, with respect to persons who made Campaign Donations in Massachusetts (the "Putative Massachusetts Class Members"); specifically, CVS violated Mass. Gen. Laws Ch. 93a, § 2(a).

142. The Putative Massachusetts Class Members are entitled to statutory damages of $25 pursuant to Mass. Gen. Laws Ch. 93a, § 9(3).

143. The Putative Massachusetts Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Mass. Gen. Laws Ch. 93a, § 9(3).

144. The Putative Massachusetts Class Members are entitled to reasonable legal fees pursuant to Mass. Gen. Laws Ch. 93a, § 9(4).

## MICHIGAN

## MICHIGAN CONSUMER PROTECTION ACT

### (Mich. Comp. Laws §§ 445.901 - 445.922)

145. CVS violated the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901 - 445.922, with respect to persons who made Campaign Donations in Michigan (the "Putative Michigan Class Members"); specifically, CVS violated Mich. Comp. Laws § 445.903(1)(s).

146. The Putative Michigan Class Members are entitled to statutory damages of $5,000 pursuant to Mich. Comp. Laws § 445.911(3).

147. The Putative Michigan Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Mich. Comp. Laws § 445.911(1)(b).

148.     The Putative Michigan Class Members are entitled to reasonable legal fees pursuant to Mich. Comp. Laws § 445.911(3).

## MINNESOTA

### MINNESOTA PREVENTION OF CONSUMER FRAUD ACT

### (Minn. Stat. §§ 325f.68 - 325f.694)

149.     CVS violated the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325f.68 - 325f.694, with respect to persons who made Campaign Donations in Michigan (the "Putative Minnesota Class Members"); specifically, CVS violated Minn. Stat. §§ 325f.69(1).

150.     The Putative Minnesota Class Members are entitled to actual damages pursuant to Minn. Stat. § 8.31(3)(a).

151.     The Putative Minnesota Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Minn. Stat. § 8.31(3)(a).

152.     The Putative Minnesota Class Members are entitled to reasonable legal fees pursuant to Minn. Stat. § 8.31(3)(a).

## MONTANA

### MONTANA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION ACT

### (Mont. Code Ann. §§ 30-14-101 - 30-14-157)

153.     CVS violated the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§ 30-14-101 - 30-14-157, with respect to persons who made Campaign Donations in Montana (the "Putative Montana Class Members"); specifically, CVS violated Mont. Code Ann. § 30-14-103.

154.     The Putative Montana Class Members are entitled to statutory damages of $500 pursuant to Mont. Code Ann. § 30-14-133(1)(a).

155.    The Putative Montana Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Mont. Code Ann. § 30-14-133(1)(a).

156.    The Putative Montana Class Members are entitled to reasonable legal fees pursuant to Mont. Code Ann. § 30-14-133(3).

## NEBRASKA

## NEBRASKA CONSUMER PROTECTION ACT

### (Neb. Rev. Stat. §§ 59-1601 - 59-1623)

157.    CVS violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601 - 59-1623, with respect to persons who made Campaign Donations in Nebraska (the "Putative Nebraska Class Members"); specifically, CVS violated Neb. Rev. Stat. § 59-1602.

158.    The Putative Nebraska Class Members are entitled to actual damages pursuant to Neb. Rev. Stat. § 59-1609.

159.    The Putative Nebraska Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Neb. Rev. Stat. § 59-1609.

160.    The Putative Nebraska Class Members are entitled to reasonable legal fees pursuant to Neb. Rev. Stat. § 59-1609.

## NEVADA

## NEVADA DECEPTIVE TRADE PRACTICES ACT

### (Nev. Rev. Stat. §§ 598.0903 - 598.0999)

161.    CVS violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903 - 598.0999, with respect to persons who made Campaign Donations in Nevada (the "Putative Nevada Class Members"); specifically, CVS violated Nev. Rev. Stat. § 598.0915(15).

162.    The Putative Nevada Class Members are entitled to actual damages pursuant to Nev. Rev. Stat. § 41.600(3)(a).

163.	The Putative Nevada Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Nev. Rev. Stat. § 41.600(3)(b).

164.	The Putative Nevada Class Members are entitled to reasonable legal fees pursuant to Nev. Rev. Stat. § 41.600(3)(c).

## NEW HAMPSHIRE

### NEW HAMPSHIRE CONSUMER PROTECTION ACT

### (N.H. Rev. Stat. Ann. §§ 358-A:1 - 358-A:13)

165.	CVS violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:1 - 358-A:13, with respect to persons who made Campaign Donations in New Hampshire (the "Putative New Hampshire Class Members"); specifically, CVS violated N.H. Rev. Stat. Ann. § 358-A:2.

166.	The Putative New Hampshire Class Members are entitled to statutory damages of $1,000 pursuant to N.H. Rev. Stat. Ann. § 358-A:10(I).

167.	The Putative New Hampshire Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to N.H. Rev. Stat. Ann. § 358-A:10(I).

168.	The Putative New Hampshire Class Members are entitled to reasonable legal fees pursuant to N.H. Rev. Stat. Ann. § 358-A:10(I).

## NEW JERSEY

### NEW JERSEY CONSUMER FRAUD ACT

### (N.J. Stat. Ann. §§ 56:8-1 - 56:8-227)

169.	CVS violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 - 56:8-227, with respect to persons who made Campaign Donations in New Jersey (the "Putative New Jersey Class Members"); specifically, CVS violated N.J. Stat. Ann. § 56:8-2.

170.	The Putative New Jersey Class Members are entitled to threefold actual damages

pursuant to N.J. Stat. Ann. § 56:8-19.

171.    The Putative New Jersey Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to N.J. Stat. Ann. § 56:8-19.

172.    The Putative New Jersey Class Members are entitled to reasonable legal fees pursuant to N.J. Stat. Ann. § 56:8-19.

## NEW MEXICO

## NEW MEXICO UNFAIR PRACTICES ACT

### (N.M. Stat. Ann. §§ 57-12-1- 57-12-26)

173.    CVS violated the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1- 57-12-26, with respect to persons who made Campaign Donations in New Mexico (the "Putative New Mexico Class Members"); specifically, CVS violated N.M. Stat. Ann. § 57-12-3.

174.    The Putative New Mexico Class Members are entitled to statutory damages of $100 pursuant to N.M. Stat. Ann. § 57-12-10(B).

175.    The Putative New Mexico Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to N.M. Stat. Ann. § 57-12-10(A).

176.    The Putative New Mexico Class Members are entitled to reasonable legal fees pursuant to N.M. Stat. Ann. § 57-12-10(C).

## NEW YORK

## NEW YORK GENERAL BUSINESS LAW § 349

### (N.Y. Gen. Bus. Law § 349)

177.    CVS violated the N.Y. Gen. Bus. Law § 349, with respect to persons who made Campaign Donations in New York (the "Putative New York Class Members"); specifically, CVS violated N.Y. Gen. Bus. Law § 349(a).

178.    The Putative New York Class Members are entitled to statutory damages of $50

pursuant to N.Y. Gen. Bus. Law § 349(h).

179.    The Putative New York Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to N.Y. Gen. Bus. Law § 349(h).

180.    The Putative New York Class Members are entitled to reasonable legal fees pursuant to N.Y. Gen. Bus. Law § 349(h).

## NORTH CAROLINA

### NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

### (N.C. Gen. Stat. Ann. §§ 75-1 - 75-43)

181.    CVS violated the North Carolina Unfair And Deceptive Trade Practices Act, N.C. Gen. Stat. Ann.§§ 75-1 - 75-43, with respect to persons who made Campaign Donations in North Carolina (the "Putative North Carolina Class Members"); specifically, CVS violated N.C. Gen. Stat. Ann.§ 75-1.1(a).

182.    The Putative North Carolina Class Members are entitled to treble actual damages pursuant to N.C. Gen. Stat. Ann.§ 75-16.

183.    The Putative North Carolina Class Members are entitled to reasonable legal fees pursuant to N.C. Gen. Stat. Ann.§ 75-16.1(1).

## NORTH DAKOTA

### NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING PRACTICES ACT

### (N.D. Cent. Code §§ 51-15-01- 51-15-12)

184.    CVS violated the North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code §§ 51-15-01- 51-15-12, with respect to persons who made Campaign Donations in North Dakota (the "Putative North Dakota Class Members"); specifically, CVS violated N.D. Cent. Code § 51-15-02.

185.     The Putative North Dakota Class Members are entitled to actual damages pursuant to N.D. Cent. Code § 51-15-09.

186.     The Putative North Dakota Class Members are entitled to reasonable legal fees pursuant to N.D. Cent. Code § 51-15-09.

## OHIO

## OHIO CONSUMER SALES PRACTICES ACT

### (Ohio Rev. Code §§ 1345.01 - 1345.13)

187.     CVS violated the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01 - 1345.13, with respect to persons who made Campaign Donations in Ohio (the "Putative Ohio Class Members"); specifically, CVS violated Ohio Rev. Code § 1345.02(A).

188.     The Putative Ohio Class Members are entitled to actual damages pursuant to Ohio Rev. Code § 1345.09(A).

189.     The Putative Ohio Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Ohio Rev. Code § 1345.09(D).

190.     The Putative Ohio Class Members are entitled to reasonable legal fees pursuant to Ohio Rev. Code § 1345.09(F)(2).

## OKLAHOMA

## OKLAHOMA CONSUMER PROTECTION ACT

### (15 Okla. St. Ann. §§ 751 - 764.1)

191.     CVS violated the Oklahoma Consumer Protection Act, 15 Okla. St. Ann. §§ 751 - 764.1, with respect to persons who made Campaign Donations in Oklahoma (the "Putative Oklahoma Class Members"); specifically, CVS violated 15 Okla. St. Ann. § 753(20).

192.     The Putative Oklahoma Class Members are entitled to actual damages pursuant to 15 Okla. St. Ann. § 761.1(A).

193.    The Putative Oklahoma Class Members are entitled to reasonable legal fees pursuant to 15 Okla. St. Ann. § 761.1(A).

## OREGON

## OREGON UNLAWFUL TRADE PRACTICES ACT

### (Ore. Rev. Stat. §§ 646.605 - 646.691)

194.    CVS violated the Oregon Unlawful Trade Practices Act, Ore. Rev. Stat. §§ 646.605 - 646.691, with respect to persons who made Campaign Donations in Oregon (the "Putative Oregon Class Members"); specifically, CVS violated Ore. Rev. Stat. § 646.607(1).

195.    The Putative Oregon Class Members are entitled to statutory damages of $200 pursuant to Ore. Rev. Stat. § 646.638(1).

196.    The Putative Oregon Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Ore. Rev. Stat. § 646.638(1).

197.    The Putative Oregon Class Members are entitled to reasonable legal fees pursuant to Ore. Rev. Stat. § 646.638(3).

## SOUTH CAROLINA

## SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT

### (S.C. Code Ann. §§ 39-5-10 - 39-5-180)

198.    CVS violated the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10 - 39-5-180, with respect to persons who made Campaign Donations in South Carolina (the "Putative South Carolina Class Members"); specifically, CVS violated S.C. Code Ann. § 39-5-20(a).

199.    The Putative South Carolina Class Members are entitled to actual damages pursuant to S.C. Code Ann. § 39-5-140(a).

200.    The Putative South Carolina Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to S.C. Code Ann. § 39-5-140(a).

201. The Putative South Carolina Class Members are entitled to reasonable legal fees pursuant to S.C. Code Ann. § 39-5-140(a).

## SOUTH DAKOTA

### SOUTH DAKOTA DECEPTIVE TRADE
### PRACTICES AND CONSUMER PROTECTION ACT

### (S.D. Codified Laws §§ 37-24-1 - 37-24-58)

202. CVS violated the South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws §§ 37-24-1 - 37-24-58, with respect to persons who made Campaign Donations in South Dakota (the "Putative South Dakota Class Members"); specifically, CVS violated S.D. Codified Laws § 37-24-6(1).

203. The Putative South Dakota Class Members are entitled to actual damages pursuant to S.D. Codified Laws § 37-24-31.

## TENNESSEE

### TENNESSEE CONSUMER PROTECTION ACT

### (Tenn. Code Ann. §§ 47-18-101 - 47-18-132)

204. CVS violated the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 - 47-18-132, with respect to persons who made Campaign Donations in Tennessee (the "Putative Tennessee Class Members"); specifically, CVS violated Tenn. Code Ann. § 47-18-104(a).

205. The Putative Tennessee Class Members are entitled to actual damages pursuant to Tenn. Code Ann. § 47-18-109(a)(1).

206. The Putative Tennessee Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Tenn. Code Ann. § 47-18-109(a)(3).

207. The Putative Tennessee Class Members are entitled to reasonable legal fees pursuant to Tenn. Code Ann. § 47-18-109(e)(1).

# TEXAS

## TEXAS DECEPTIVE TRADE PRACTICES
## ACT – CONSUMER PROTECTION ACT

### (Tex. Bus. & Com. Code §§ 17.41 - 17.63)

208.    CVS violated the Texas Deceptive Trade Practices Act – Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41 - 17.63, with respect to persons who made Campaign Donations in Texas (the "Putative Texas Class Members"); specifically, CVS violated Tex. Bus. & Com. Code § 17.46(a).

209.    The Putative Texas Class Members are entitled to actual damages pursuant to Tex. Bus. & Com. Code § 17.50(b)(1).

210.    The Putative Texas Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Tex. Bus. & Com. Code § 17.50(b)(2).

211.    The Putative Texas Class Members are entitled to reasonable legal fees pursuant to Tex. Bus. & Com. Code § 17.50(d).

# UTAH

## UTAH CONSUMER SALES PRACTICES ACT

### (Utah Code Ann. §§ 13-11-1 - 13-11-23)

212.    CVS violated the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1 - 13-11-23, with respect to persons who made Campaign Donations in Utah (the "Putative Utah Class Members"); specifically, CVS violated Utah Code Ann. §§ 13-11-4(1).

213.    The Putative Utah Class Members are entitled to statutory damages of $2,000 pursuant to Utah Code Ann. § 13-11-19(2).

214.    The Putative Utah Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Utah Code Ann. § 13-11-19(1)(b).

215.    The Putative Utah Class Members are entitled to reasonable legal fees pursuant to Utah Code Ann. § 13-11-19(5)(b).

## VERMONT

## VERMONT CONSUMER FRAUD ACT

## (9 Vt. Stat. Ann. §§ 2451 - 2466c)

216.    CVS violated the Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. §§ 2451 - 2466c, with respect to persons who made Campaign Donations in Vermont (the "Putative Vermont Class Members"); specifically, CVS violated 9 Vt. Stat. Ann. § 2453(a).

217.    The Putative Vermont Class Members are entitled to statutory damages of $2,000 pursuant to 9 Vt. Stat. Ann. § 2461(b).

218.    The Putative Vermont Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to 9 Vt. Stat. Ann. § 2461(b).

219.    The Putative Vermont Class Members are entitled to reasonable legal fees pursuant to 9 Vt. Stat. Ann. § 2461(b).

## VIRGINIA

## VIRGINIA CONSUMER PROTECTION ACT

## (Va. Code §§ 59.1-196- 59.1-207)

220.    CVS violated the Virginia Consumer Protection Act, Va. Code §§ 59.1-196- 59.1-207, with respect to persons who made Campaign Donations in Virginia (the "Putative Virginia Class Members"); specifically, CVS violated Va. Code § 59.1-200(14).

221.    The Putative Virginia Class Members are entitled to statutory damages of $500 pursuant to 9 Va. Code § 59.1-204(A).

222.    The Putative Virginia Class Members are entitled to reasonable legal fees pursuant to 9 Va. Code § 59.1-204(B).

**WASHINGTON CONSUMER PROTECTION ACT**

**(Rev. Code Wash. Ann. §§ 19.86.010 - 19.86.920)**

223.    CVS violated the Washington Consumer Protection Act, Rev. Code Wash. Ann. §§ 19.86.010 - 19.86.920, with respect to persons who made Campaign Donations in Washington (the "Putative Washington Class Members"); specifically, CVS violated Rev. Code Wash. Ann. § 19.86.020.

224.    The Putative Washington Class Members are entitled to actual damages pursuant to Rev. Code Wash. Ann. § 19.86.090.

225.    The Putative Washington Class Members are entitled to an order enjoining CVS's unlawful practices pursuant to Rev. Code Wash. Ann. § 19.86.090.

226.    The Putative Washington Class Members are entitled to reasonable legal fees pursuant to Rev. Code Wash. Ann. § 19.86.090.

**WISCONSIN**

**WISCONSIN DECEPTIVE TRADE PRACTICES ACT**

**(Wis. Stat. § 100.18)**

227.    CVS violated the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, with respect to persons who made Campaign Donations in Wisconsin (the "Putative Wisconsin Class Members"); specifically, CVS violated Wis. Stat. § 100.18(1).

228.    The Putative Wisconsin Class Members are entitled to actual damages pursuant to Wis. Stat. § 100.18(11)(b)(2).

229.    The Putative Wisconsin Class Members are entitled to reasonable legal fees pursuant to Wis. Stat. § 100.18(11)(b)(2).

# WYOMING

## WYOMING CONSUMER PROTECTION ACT

### (Wyo. Stat. §§ 40-12-101 - 40-12-114)

230.     CVS violated the Wyoming Consumer Protection Act, Wyo. Stat. §§ 40-12-101 - 40-12-114, with respect to persons who made Campaign Donations in Wyoming (the "Putative Wyoming Class Members"); specifically, CVS violated Wyo. Stat. § 40-12-105(a)(xv).

231.     The Putative Wyoming Class Members are entitled to actual damages pursuant to Wyo. Stat. § 40-12-108(a).

232.     The Putative Wyoming Class Members are entitled to reasonable legal fees pursuant to Wyo. Stat. § 40-12-108(b).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

(a)     Awarding, to Plaintiff and the other members of the Putative Class, damages as a result of Defendant's fraud under the common law of the 50 States and the District of Columbia;

(a)     Awarding, to Plaintiff and the other members of the Putative Class, damages as a result of Defendant's breaches of contract under the common law of the 50 States and the District of Columbia;

(c)     Awarding, to Plaintiff and the other members of the Putative Class, the relief available under the Putative Class members' respective consumer-protection statutes; and

(d)     Awarding, to Plaintiff and the other members of the Putative Class, the costs and disbursements of this action, and such other and further relief as the Court deems just and proper.

Dated: _____ ___, _____

Respectfully submitted,

 s/ *Todd C. Bank*
TODD C. BANK
  ATTORNEY AT LAW, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York 11415
(718) 520-7125
By Todd C. Bank

*Counsel to Plaintiff*

# EXHIBIT "A"

## Corporate Sponsorship Agreement



# Corporate Sponsorship Agreement

This Agreement is made effective April 13, 2021 between the American Diabetes Association, an Ohio non-profit corporation with its principal office located at 2451 Crystal Drive, Suite 900, Arlington, VA 22202 ("ADA") and CVS Pharmacy, Inc., a Rhode Island corporation, located at One CVS Drive, Woonsocket, Rhode Island 02895 ("Company"). ADA and Company are sometimes individually referred to herein as the "Party" and collectively as the "Parties."

1. **Purpose**: The purpose of this Agreement is to benefit the ADA and advance its non-profit mission to prevent and cure diabetes and to improve the lives of all people affected by diabetes through a Project Power Strategic Partnership (the "Sponsorship"). Company understands that as a non-profit charitable organization the ADA cannot promote or endorse Company's products or services, either explicitly or implicitly. The ADA may require that a disclaimer stating that Company's participation in this Sponsorship does not convey or imply the ADA's approval, endorsement, certification, acceptance, or referral of any product or service of Company. The Sponsorship includes the Program and Event activities and other terms set forth in Attachment A.

2. **Scope:** The ADA agrees to identify and acknowledge Company as a supporter of the organization and the diabetes cause, as permitted in connection with qualified sponsorship payments and royalties under Section 513(i) and Section 512 of the Internal Revenue Code and Treasury regulations thereunder ("Code"). Company agrees not to knowingly take any actions that would jeopardize the tax-exempt status of ADA under section 501(c)(3) of the Code. Company agrees to inform its business partners about ADA's tax-exempt status. Company agrees to provide its services, as defined in Attachment A, in accordance with all applicable laws and in accordance with standards of decorum and taste so as not to adversely reflect upon the ADA or its mission. ADA may publicize its relationship with Company and use any photos, videos, written materials and other collateral matter developed under this Agreement as further described in Attachment A, for its business purposes including any marketing.

3. **Territory:** The geographic territory for this Agreement is the United States.

4. **Intellectual Property:** The ADA is the sole and exclusive owner of its name and logos, with or without accompanying words, and has the legal right to enter into this Agreement. In addition, any materials provided by or developed by the ADA remain the property of the ADA. The ADA's names, logos, and various marks are "the ADA Marks", as listed in Attachment B. The ADA's ownership of the ADA Marks is or shall be secured through registration, or under common law, or both. Company's use of the ADA Marks does not create ownership rights in the ADA Marks for Company. Company shall not, during the period of this Agreement, or any time thereafter, challenge ADA's exclusive ownership or registration of ADA's Marks, including any and all moral rights. Company is the sole and exclusive owner of its name, logos, and marks (the "Company Marks"), which include, without limitation, the names, logos, and marks listed in Attachment B as Company Marks.

5. **License:** The ADA grants Company a non-exclusive, limited, revocable and conditional license during the term to use the ADA Marks, solely to identify Company as a supporter of the ADA. Use

by Company of the ADA Marks is limited to the ADA Marks as specifically authorized by the ADA, such ADA Marks may not be revised or altered in any way without prior written consent, and must be displayed in the same form and colors, and such license does not extend to any other marks of the ADA. Use by Company of the ADA Marks on and in conjunction with its product or brand is conditioned upon Company's compliance with the terms of this Agreement generally and the observance of the specifications for permissible uses of the ADA Marks as stated herein and as may be given to Company, from time to time in writing by the ADA. Nothing shall prohibit the ADA, during the period of this Agreement, from licensing the use of substantially similar marks for substantially similar uses in working with other companies or industries. Company may not permit any third party to use the ADA Marks without the express prior written approval of the ADA, which may be withheld for any reason. The ADA Marks must be used in a professional manner and solely in connection with the activities authorized under this Agreement. The Company grants the ADA a non-exclusive, limited, revocable and conditional license during the term to use the Company Marks, solely to identify Company as a supporter of the ADA. The Company Marks must be used solely in connection with the activities authorized under this Agreement.

6. **Use of ADA Marks:** The ADA Marks shall not be placed adjacent to the mark of another organization concerned with diabetes, or those of a company that manufactures products or provides services related to diabetes, without the ADA's specific prior written consent, which may be withheld for any reason. The ADA Marks may not be used for individual, personal or professional gain, or other private benefit, and Company shall not use the ADA Marks in any manner that, in the ADA's sole discretion and judgment, diminishes their value or otherwise dilutes the ADA Marks; discredits the ADA or tarnishes its reputation and goodwill; is false, misleading or likely to cause confusion, mistake or deception; violates the rights of others; violates any federal, state or local law, regulation or other public policy; or mischaracterizes the relationship between the Parties, including but not limited to the fact that Company is a separate and distinct legal entity from, and is not an agent of, the ADA. The use of Company Marks by ADA shall be in furtherance of the sponsorship elements set forth in Attachment A.

7. **Quality:** All products, materials, services or other items of Company with which the ADA Marks are used shall be maintained throughout the period of this Agreement at or above their quality at the beginning of the term.

8. **Review:** All uses of the ADA Marks, including the specific placement of the ADA Marks on Company's product and all promotional materials, are subject to the ADA's prior written approval, which approval shall not be in its sole discretion. Any reference to the ADA in electronic or other publication or broadcast is subject to the ADA's prior written approval in each instance, which approval shall not be unreasonably withheld. Approval or disapproval of the use of either Party's Marks shall be provided by the respective Party within ten (10) business days of request. Failure to have materials and/or products featuring the ADA Marks reviewed in advance of making then available in the marketplace may be considered breach of the Agreement and cause for immediate cancellation.

9. **Infringement:** Each Party shall take measures it deems necessary to assure that none of the material which is prepared, or which shall be prepared, pursuant to this Agreement, violates or infringes upon any trademark or copyright, or any other right of any person, company or other entity. Both Parties shall protect against infringement of the ADA Marks. Each Party shall provide reasonable assistance

to the other party in protecting the ADA Marks upon request. Each Party shall notify the other party immediately if it learns of any infringement of the ADA Marks or Company Marks. The Party owning the infringed mark shall have sole discretion to determine whether to pursue such infringement.

10. **Indemnification:** Each Party agrees to defend, indemnify and hold harmless the other Party, its officers, directors, employees, volunteers, subcontractors and agents, from any and all claims, losses, damages, liabilities, judgments, or settlements, including reasonable attorneys' fees, costs and other expenses incurred on account of the their respective negligent acts or omissions, and those of their directors, employees, agents, contractors and sub- contractors, in connection with this Agreement.

11. **Notification:** Except as may be limited by applicable law, each of the Parties hereto shall promptly notify the other of, and reasonably cooperate in responding to or defending any inquiry, investigation, claim, suit or other cause of action instituted, asserted or threatened against either Party hereto or any of their respective Affiliates, shareholders, directors, officers, agents, independent contractors or employees and arising out of or relating to either Party's obligations under this Agreement or any other matter contemplated hereby.

12. **Insurance:** During the term of this Agreement, and before any sponsorship or promotional activities are conducted under this Agreement, Company shall obtain and maintain at its expense, Commercial General Liability Insurance coverage with an insurance carrier with a Best's rating of A-. The insurance shall be in an amount of: $2,000,000 per occurrence and $2,000,000 aggregate with a $2,000,000 aggregate for products and completed operations with an excess of $5,000,000 in an excess liability policy. The ADA must be included as an additional insured, and shall be provided at least 30 days' notice for cancellation of policy and 10-day notice for non-payment of premium. Such insurance shall be primary and non-contributory.

13. **Term:** This Agreement is valid from April 13, 2021 through April 12, 2024.

14. **Termination:** Either Party may terminate this Agreement if the other Party breaches any term of this Agreement and does not remedy such breach within ten (10) business days following the other Party's written request. A breach of this Agreement by Company shall include, but is not limited to: (1) misuse of the ADA Marks or content; or (2) bankruptcy of Company or its assignment for the benefit of creditors. Should Company terminate this Agreement in the absence of breach, Company's commitment to pay survives cancellation of this Agreement. Should ADA terminate this Agreement in the absence of breach, Company's commitment to pay is extinguished. All rights to use the ADA Marks or Company Marks end when the Agreement is canceled, terminates or expires.

15. **Effect of Termination or Expiration:** Upon termination or expiration, the Company may make no further use of the ADA Marks, or other proprietary property or materials provided, developed or intended for use in connection with the Sponsorship, without prior written authorization by ADA, other than as set out in this section. All other originals and copies of the ADA Marks (whether in printed, electronic, recorded, and/or other tangible form) shall be discarded or destroyed within five (5) business days and any digital use of the ADA Marks by the Company shall be deleted or removed from any public fora, to the extent such digital uses are under the dominion or control of the Company. The obligations under sections 6, 7, 8, 9, and 19 and this section 15 shall survive the

termination or expiration of this Agreement.

16. **Force Majeure:**  Neither Party shall be in breach of this Agreement if Program or Event activities are cancelled as a result of forces beyond the Party's reasonable control, such as unusually severe weather, fire, explosion, civil disturbance, terrorism or act of God.  Whenever possible, any schedule for performance stated above shall be extended as necessary to overcome the effects of such force majeure, or the Company promotion shall be transferred to another ADA program or event.

17. **Liability:** Company and ADA agree that each is responsible for its own business activities and for its action or inaction relating to the specific Program or Event activities under this Agreement.  Company shall be responsible for securing any necessary release forms from participants in any Company activity not held at the ADA's Program or Event activity.

18. **Non-Assignment:**  This Agreement shall be between the Parties only, and does not grant rights to any other party.  This Agreement may not be assigned by either Party without the prior written consent of the other Party.  Any amendment of this Agreement must be in writing signed by authorized representatives of each of the Parties.

19. **Confidentiality**:  The provisions of this Agreement shall be maintained by the Parties as confidential during the Term and thereafter.  In addition, any and all aspects of both Parties' business, including without limitation all non-public information or trade secrets directly or indirectly related thereto, that the other Party becomes exposed to during the Term, and extensions or renewals, of this Agreement shall be maintained as confidential, and shall not be further disclosed by the receiving Party, or used by the receiving Party for any purpose other than performing hereunder during the Term or thereafter.  The disclosing Party shall at all times retain full ownership in and to all information respecting its business, and shall be the sole and exclusive owner of all materials it creates pursuant to this Agreement, except as may be otherwise provided herein. The obligation to maintain confidentiality under this Section shall survive the termination of this Agreement for a period of three (3) years.

20. **Independence**:  Nothing in this Agreement shall create a partnership, joint venture or establish the relationship of principal and agent or any other relationship of a similar nature between the Parties. The Parties to this Agreement shall be considered independent contractors and neither Party is granted the right or authority to assume or create any obligation on behalf of or in the name of the other.

21. **Survival:**  Any and all warranties, provisions, rights and obligations of the Parties herein described and agreed to be performed subsequent to the termination of this Agreement, including but not limited to obligations respecting confidentiality and indemnification, shall survive the termination of this Agreement.

22. **Successors and Assigns**: This Agreement shall be binding on the parties, and on their successors and assigns, without regard to whether it is expressly acknowledged in any instrument of succession or assignment.  However, Company may only assign its responsibilities under this Agreement with ADA's prior written approval as provided in Section 18.

23. **Entire Agreement:**  This Agreement, including any attachments, if applicable, and any other

documents and agreements contemplated herein, constitute the entire agreement between the Parties with regard to the subject matter. This Agreement supersedes all previous agreements between or among the Parties respecting such, and there are no other agreements or understandings between or among the Parties other than as set forth herein.

24. **Amendment**: No amendment, alteration, modification of or addition to this Agreement, and no waiver of rights or remedies hereunder, shall be valid or binding unless expressed in writing and signed by the Party to be bound thereby.

25. **Compliance with Anti-Discrimination Laws and Policies:** Company verifies that it complies with all laws prohibiting discrimination against people with diabetes including, but not limited to, the Americans with Disabilities Act, the Rehabilitation Act of 1973, and state and municipal anti-discrimination laws. Company states that it shall not discriminate against a qualified individual with diabetes, because of the person's diabetes, in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, or other terms, conditions, and privileges of employment. Company further verifies that each person with diabetes, whether or not the person uses insulin, is eligible for any employment with Company for which he/she is otherwise qualified, and that Company does not have any rule or policy that automatically excludes a person with diabetes from employment in any position with Company.

26. **Notice:** All written notices required to be given pursuant to the terms set forth in this Agreement shall be deemed given on the day notice is either delivered personally, or by fax or overnight or certified delivery or deposited in the mail addressed as specified below:

Company: CVS Pharmacy, Inc.
Address: One CVS Drive, Woonsocket, Rhode Island 02895
Contact/Title: Joanne Dwyer, VP Corporate Social Responsibility and Corporate Giving
With a cc to: Thomas Moffatt, VP and Assistant General Counsel

American Diabetes Association
P.O. Box 7023, Merrifield, VA 22116-7023
Contact/Title: Tracey D. Brown, CEO
With a cc to: Sean C.E. McDonough, VP and General Counsel, Legal Affairs

27. **<u>Governing Law.</u>** This Agreement is subject to and shall be construed in accordance with the laws of the Commonwealth of Virginia and jurisdiction and venue shall be solely in the federal and state courts situated in the City of Alexandria or Arlington County. If any terms of this Agreement are invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule or law, such term shall be deemed reformed or deleted only to the extent necessary to comply with such statute, regulation, ordinance order or rule, and the remaining provisions of this Agreement shall remain in full force and effect.



The parties hereto have executed the agreement effective as of the date first written above.

**AMERICAN DIABETES ASSOCIATION**          **CVS PHARMACY, INC.**

| | |
|---|---|
| **By:**<br><br>*Tracey D. Brown*<br>—620E6486061442C… | **By:**<br><br>*Eileen H. Boone* |
| **Name:**<br>Tracey D. Brown | **Name:**<br>Eileen Howard Boone |
| **Title:**<br>Chief Executive Officer | **Title:**<br>SVP, Corporate Social Responsibility & Philanthropy |
| **Date:**<br>4/16/2021 | **Date:**<br>4/16/21 |
| **By:**<br><br>*Charlotte M. Carter*<br>—C1149642B39446E… | |
| **Name:**<br>Charlotte M. Carter | |
| **Title:**<br>Chief Financial Officer | |
| **Date:**<br>4/16/2021 | |



# Attachment A

ACKNOWLEDGEMENT OF SUPPORT

The following outlines the type of acknowledgment that has been agreed upon by the Company and the ADA and describes the appropriate recognition of support, in accordance with the Internal Revenue Code.  (All advertising, promotional and educational materials, with or without the ADA marks, are subject to the ADA's advance review and approval.)

The Company Brand(s) covered by this Agreement: CVS Health, CVS Pharmacy, Aetna

**<u>Designation</u>:  Project Power Strategic Partner**

Company shall be recognized as a Project Power Strategic Partner of the ADA.  Such title acknowledges Company's commitment to supporting the mission of the ADA. The term must be used intact; Company may not modify the term or call itself a "Partner" of the Association or refer to the sponsorship as a "Partnership." As a Project Power Strategic Partner, Company shall participate in and receive recognition for the following activities for the Term, as agreed upon by Company and the ADA. The ADA shall review with Company on an annual basis the recognition of Company's participation in the activities outlined below.

**RELATIONSHIP ELEMENTS**

**A.  Use of Intellectual Property**

As a Project Power Strategic Partner, Company shall receive the opportunity to use the ADA Marks on Company's approved educational and/or promotional materials, which meet the ADA's guidelines; consistent with the approved ADA Clinical Practice Recommendations including the *Standards of Medical Care for Diabetes* for the Term of this Agreement (as illustrated on "Attachment B", attached hereto and incorporated by reference herein).

All materials are subject to advance review and written approval by the ADA. Company agrees that all educational and/or promotional messages, in which the ADA Marks appear, must be supported in science and the ADA is the final arbiter in determining whether or not its marks are suitable to appear on materials. In addition to the use of the ADA Marks, Company shall be entitled to use the following statement of relationship language:

 a) *"A Proud Supporter of American Diabetes Association® www.diabetes.org; 1-800 DIABETES"*
 b) *"A Project Power Strategic Partner of American Diabetes Association®"*

**B.  Statement of Work**

As the Project Power Strategic Partner, Company and the American Diabetes Association ("ADA"), will use our collective strength by joining together to support people to prevent and manage diabetes in our communities and fund research on the devastating health disparities that fuel the diabetes epidemic. Our winning combination of the ADA's expertise, content, credibility, national and local networks combined with Company's retail stores as trusted hubs and a talented employee base will drive our mutual commitment to ensuring all people live longer, healthier lives.

**Goals:**

Through the relationship with Company and the ADA, we will:

1. Deliver outcomes-based, gamified experiences that help adults take control of their diabetes and future adults prevent diabetes from becoming a part of their life
2. Drive people living with diabetes and prediabetes to know their numbers by taking the Diabetes Risk Test and getting health screenings
3. Fund research on health disparities that drive the diabetes epidemic

**Impact Statement**: Company is proud to be the Project Power Strategic Partner to help empower vulnerable communities to better manage and prevent prediabetes. Company has pledged $10 million dollars over three years to support people in their health journey of preventing and managing diabetes through increased awareness, knowledge, and taking actions to improve health and fund research to drive discovery and address the unmet needs leading to the future elimination of these disparities and the devasting impact on our communities. Together we will increase reach, engagement, and education for 5 million patients and caregivers to improve health outcomes.

ADA channels will measure the following to achieve this number:

- Reach (marketing/digital outreach): 3 million over three years
- Engagement (someone taking action and completing risk test): 1.5 million over three years
- Education/Impact: 20,000 over three years

Company channels will measure to achieve this number:

- Engagement (glucose screenings via Company's Project Health initiative ("Project Health")) 25 Markets plus 4 Mobile RV units estimate 600-700 per year or over 3 years the screening of over 2,000 patients.
- Reach (engagement with ADA resources and link) 1.2 million over the next 3 years.

We will do this through the following channels:

- Project Power
- American Diabetes Association Risk Test
- Worksite Reach
- American Diabetes Month
- Project Health Events
- In-Store Awareness and Activation
- Integrated Marketing and Communications

**Proposed Outcomes:**

- Serve people through awareness and activations
- Fund research on diabetes and health disparities
- Improve food choices
- Increase physical activity
- Develop behavioral problem-solving and coping skills
- Increase the # of people engaged with ADA and Company specifically in diverse, underserved populations/populations at greatest risk for diabetes
- Increase the # of people who are aware of ADA and Company resources

- Increase the # of Company employees who are engaged with the relationship, know their risk, and take action to prevent and/ or better manage their diabetes
- Reduce the number of people who don't know they are at risk or have diabetes
  - Increase the # of people who take the ADA Risk Test
  - Increase the # of high-Risk Test scorers who follow-up with a health care provider
- Increase the # of people engaged in the initiative who get a health screening
- Increase the # of people with prediabetes or diabetes who take at least one health action to prevent diabetes or better manage their diabetes

**Strategies**

Detailed descriptions of the tactics associated with each strategy are found in the following section.

<u>**Strategy 1**</u> **–** Deliver outcomes-based, gamified experiences that help adults take control of their diabetes and future adults prevent diabetes from becoming a part of their life.

**PROJECT POWER** is an outcomes-based, gamified experience that helps adults take control of their diabetes and future adults prevent diabetes from becoming a part of their life. The programs are designed to serve children and adults through tailored experiences that reach each audience. By connecting with communities across the country, ADA Project Power is bringing health education and community partners together.

**PROJECT POWER ADULTS (Year 2-3)** is designed for people 18+ diagnosed with prediabetes and type 2 diabetes. The eight-week program offers participants an opportunity to learn disease management and reduce risk factors through innovative approaches and evidence-based interventions to improve diabetes knowledge, self-care behaviors and glycemic control.

Participants are engaged through weekly dynamic lessons and discussions, meal planning, physical activity, motivational talks, cooking demons, and receive program incentives. The program is delivered at no cost. Participants are connected to mentors and health coaches to aid them in achieving their goals during the program. Weekly sessions include information sharing, discussion, information about diabetes care, and self-monitoring tools taught by trained facilitators.

Purpose: To improve diabetes self-care related knowledge and behaviors among adults with pre-diabetes and type 2 diabetes.

Objectives
- Improve food choices
- Increase to physical activity
- Develop behavioral problem-solving and coping skill

Evaluation Indicators **-** *Specific information on whether a program is achieving its goals.*
- Participant data (gender, race, ethnicity, age, educational attainment, income)
- Enrollment rate
- Engagement and completion rates
- Satisfaction
- Glucose screenings provided by Company

- Risk Test

Outcomes
- Change in diabetes knowledge
- Change in behavior: lifestyle, self-management practices, and diabetes skills
- Change in confidence
- Improved self-efficacy
- Participant satisfaction with program sessions or meetings

Projected Participants: 4,100 – two years of program
- Year 2: Expand the pilot program from 2 sites to 20 sites
- Year 3: Expand from 20 sites to 62 sites

Staff: Trained community facilitators to conduct sessions
Incentives: T-shirt, program booklet, water bottle, portion plate, self-monitoring tools, activity tracker, incentive prizes and gamification badges.


Timeline
- Six-week recruitment period
- An initial two-month phase offering 8 sessions
  - Diabetes and Prediabetes
  - What Can I Eat?
  - Blood Glucose Monitoring
  - Know Your Heart: Stroke and Heart Disease
  - Depression, Stress and Emotional Health
  - Diabetes Complications – Part 1
  - Diabetes Complications – Part 2

Program Resources
- Facilitated by trained facilitators
- ADA Total Diabetes Wellness Toolkit curriculum
- Activity trackers and supporting tools
- Social networking site
- Direct interactions with health care providers and participants
- Focus on behavior modification, managing stress and peer support

Key Stakeholders
- Company Employees
- Project Health
- Primary Care Physicians
- Faith-based Organizations (FBOs)
- Healthcare Providers (nurses and dietitians)
- Community Health Workers (CHW)
- Service Clubs

- Fraternities and Sororities
- Civic leagues
- Senior Centers

Award Ceremony and Continuation

Program culmination occurs at empowerment activity, an occasion to celebrate the transformation and health journey of each participant. The celebration bolsters renowned speakers, health exhibitors, vendors, poignant testimonials, and recognition.

**PROJECT POWER KIDS (Year 1-3)** is the ADA initiative to slow the trajectory of childhood obesity and diabetes through health promotion, nutrition education, increased physical activity and family involvement. Project Power Kids was created for elementary and middle school-aged youth to help prevent obesity and type 2 diabetes and the many complications of this disease.

The program is delivered at no cost to families as a virtual afterschool program over a three-week period with sessions twice a week. This program empowers youth to make healthy lifestyle choices to develop lifelong habits and encourages youth to develop sustainable healthy household habits.
Objectives
- **Educate** youth at risk for developing type 2 diabetes and their families
- **Engage** youth and their families in interactive physical activities and nutrition education sessions
- **Connect** youth with one another, reduce feelings of isolation, increase social skills, improve confidence and independence in healthy eating and active lifestyles.

Our program will achieve these objectives through dynamic virtual programming led by counselors trained in our traditional tracks, as well as providing a digital program delivery, all while ensuring safe, healthy, fun!

Program Resources
- **Activity Box**: Filled with attention-keeping and instructive activities and supplies
- **Project Power Activity Journal**: Educational tools, activities, journal pages, recipes, and more
- **Group Time:** Group chats and intentional programming in small group led by counselors
- **Weekly Challenges**: Connects with campers and families using Facebook and Instagram
- **Power Up! Parent Meeting:** Offers opportunities to connect with other parents and to hear healthy topics presented by healthcare professionals
- **Family Engagement:** Parent E-newsletter, Facebook polls, text surveys, etc.
- **Power Kids Club:** Offers engagement and significant touch points for youth and their families to enhance their healthy lifestyle behavior after program completion through live sessions, social media, newsletters, virtual events and more
- **Power Moves! Calendars:** Provide three months of daily suggestions for healthy behaviors that youth and families can do at home

Key Outcomes
- Increased knowledge of physical activity and nutrition

- Improved confidence making healthy food choices and how to exercise regularly
- Increased healthy behaviors including achieving physical activity and consumption of fruits, vegetables and water

Projected Participants: 9,000 – three years of program
- Year 1: Expand the program from 1 session to 2 sessions
- Year 2: Expand the program from 2 sessions to 4 sessions
- Year 3: Expand the program from 4 sessions to 8 sessions

Timeline
- Six-week recruitment period
- Three-week phase offering six meetings twice a week
  - Be Active - What Is A GO Activity
  - Be Active - GO, SLOW and WHOA Foods
  - Increase GO, Decrease WHOA - Energy Balance
  - increase GO, Decrease WHOA - Wean the Screen
  - Healthy Dining – Fast Food Choices
  - Healthy Dining - ReThink Your Drink

**Activation**:

**<u>Local Events & Engagement (Year 2-3)</u>**

Company will continue to support local markets through Project Power across our 22 pods, 50 states and the District of Columbia. Under the strategic relationship, the ADA will ensure that support is recognized across the country.

Project Power – Expansion plan

- Year 2: We will expand the program in 9 new markets that host the Project Health initiative
- Year 3: Expand to 11 additional Project Health markets

**<u>Pharmacy/Front of Store and Association Collaboration (Year 2-3)</u>**
  a. **Co-branded Educational Materials**

Association and Company shall work together to share Project Power educational materials for the diabetes patient/consumer to access in the Company's store locations, such as for example: pharmacy counter, in-aisles, tear-off sheets for patients, mini brochures, wallet-sized tip cards, or posters. Company shall be responsible for all production and distribution costs.

  b. **Project Health Collaboration**

Association and Company shall collaborate on Project Health (low income, urban) event(s) in conjunction with and according to the Project Power program. Association and Company shall identify content to be co-branded that may be distributed to participants at the event and the Association will help to promote Project Health through the Association website.

c. **In-Store radio promotion**
   Provide the Association with one or more in-store radio promotion(s)/advertisement(s). To be created by both parties.
d. **Develop in-store co-branded partnership signage**. To be determined by both parties.

| Project Power | Year 2/ Number of Sites | Year 3/ Number of Sites |
|---|---|---|
| 1. Alabama (Mobile/Birmingham) | | |
| 2. Atlanta (Georgia) | | |
| 3. California (Fresno) | | 2 |
| 4. California (Los Angeles) | 2 | 4 |
| 5. California (Sacramento) | | 2 |
| 6. California (San Diego) | | 2 |
| 7. California (San Francisco) | | 2 |
| 8. Florida (Miami) | | 2 |
| 9. Florida (Orlando/Tallahassee) | | 2 |
| 10. Illinois (Chicago) | | 2 |
| 11. Louisiana (Baton R/NO) | 2 | 4 |
| 12. Massachusetts (Boston) | 2 | 4 |
| 13. Michigan (Detroit) | | 2 |
| 14. Mississippi (Jackson/Memphis) | 2 | 4 |
| 15. New York City | 2 | 4 |
| 16. North Carolina (Charlotte) | 2 | 4 |
| 17. Ohio (Cleveland) | 2 | 4 |
| 18. Pennsylvania (Philly) | 2 | 4 |
| 19. Rhode Island (Providence) | | |
| 20. South Carolina (Columbia/Charleston) | | |
| 21. Tennessee (Memphis/Knoxville) | | 2 |
| 22. Texas (Dallas Fort-Worth) | 2 | 4 |
| 23. Texas (Houston) | | 2 |
| 24. Washington DC | | 2 |
| 25. New Jersey | 2 | 4 |
| **Total Sites** | **20** | **62** |

**Strategy 2** – Drive people living with diabetes and prediabetes to know their numbers by taking the Diabetes Risk Test, getting health screenings, and accessing resources

**Activation**:
Company Digital Channels
- Embed the ADA-branded "Risk Test" on the Company website(s) for the term of the campaign with ADA logo inclusion.

- Use of cobranded risk test in all facets of program for digital and hard copy distribution. Multiple languages where needed.
- Develop a marketing and communication strategy for the partnership term and drive Company Employee Engagement

**Project Health (Year 2-3)** : With Project Health, offer free screenings of key health indicators such as A1C, blood pressure, and BMI. Encourage follow-up with health care provider

**Pharmacy/Front of Store and Association Collaboration**
   a. **Co-branded Educational Materials (Year 2-3)**
Association and Company shall work together to share risk-specific educational materials for the consumer to access in the Company's store locations, such as for example: pharmacy counter, in-aisles, tear-off sheets for patients, mini brochures, wallet-sized tip cards, or posters. Company shall be responsible for all production and distribution costs.

   b. **Project Health Collaboration (Year 2-3)**
Association and Company shall collaborate on Company's Project Health (low income, urban) event(s) in order to drive awareness of risk and utilization of education and risk-specific materials. Association and Company shall identify content to be co-branded that may be distributed to participants at the event and the Association will help to promote Project Health through the Association website.

   c. **In-Store radio promotion (Year 1-3)**
Provide the Association with one or more in-store radio promotion(s)/advertisement(s). To be created by both parties.

**Employers and Plans:** Project Power Workplace Wellness Tool Kit (Year 2-3)
A Project Power customized educational and resource tool kit for Aetna plan manager distribution. A digital customized tool kit to include:
- Electronic health and wellness tip sheets (hard copies available)
  - Risk test (multiple languages)
  - Diabetes 101: Getting to know diabetes
- Corporate office resource kit (including but not limited to)
  - Health meeting tips
  - Healthy workplace preparedness
  - Stair posters
- Lunch and Learn series Project Power Ask the Expert Q and A bi-annual series; customized including Company and ADA experts – suggested timeline and curriculum:
  - Year one focus: prevention & prediabetes, understanding diabetes
  - Year two: nutrition, eye health
  - Year three: technology and diabetes time in range
- Corporate Communications resources
  - Content for newsletters. 2 articles per quarter to share in newsletters.

- Food Hub Recipes - 2 new recipes per quarter.
- Healthy living videos
- Employee Engagement Opportunities
  - Project Power participation – unique company activations during the Project Power 8-week campaign and the month of November (American Diabetes Month)
- Workplace giving - Pin pad considerations and year-end giving connections/ADA information shared /consider us for year-end giving etc.
- Enrollment in Project Power full program (where available)

**<u>Strategy 3</u>** – Fund research on health disparities that drive the diabetes epidemic

Our research investments focus on sparking the next big discovery through innovative, high-impact projects that encourage scientists to take calculated risks that can yield high rewards. We maximize our limited research dollars by allocating our funds through our targeted research program which is vetted through our rigorous expert peer-review process performed by leading diabetes scientists. The targeted research program allows ADA supporters to specify areas of interest for investment that align with ADA's expert assessment of high-needs, emerging areas relevant to advancing diabetes science and care.

The current health pandemic and its disproportionate toll on minority, low-income, and historically underserved Americans shines a troubling light on historic, systemic inequities in American health care. At the same time, there is a significant gap in scientific knowledge regarding the health disparities that fuel this crisis.

The ADA and Company will fund research addressing this unmet need and drive discovery that will lead to the future elimination of these disparities and the devasting impact on our communities.

**Integrated Marketing and Communications (Year 1-3):**

Company will be recognized as the Project Power Strategic Partner for the term of this agreement. An integrated marketing campaign will be developed and delivered for 4 weeks each year recognizing Company's support. Activations will be mutually agreed upon and reviewed for impact and assessed annually.

In addition to the 4-week integrated Project Power Campaign, Company will be engaged in the following ways:

**American Diabetes Month® (Year 2-3)**
During the month of November for the term of our relationship, Company will be positioned as the Project Power Strategic Partner. Company logo will be included on ADA campaign webpage, toolkit materials and communications. Recognition elements shall include:
- Premier positioning as the national Project Power Strategic Partner
- Inclusion of Company logo in campaign materials (that may include collateral, PSA videos and web banners) and social media
- Inclusion of Company in press release announcing the campaign
- Inclusion on ADA website
- Rights to promote the Project Power Strategic Partnership

- Retail/ Pin Pad campaign

Company shall have the right to use the ADA name and logo and/or campaign name or hashtag to promote that it is the Project Power Strategic Partner of American Diabetes Month, including in advertising and promotional materials.

**Giving Tuesday** (Year 1-3)

Our Giving Tuesday generosity movement features five e-mails over the course of one week, a lightbox on the homepage, paid advertising (Google, Bing, Facebook), social posts (national and local), and either a dedicated donation form or an altering of our main form. We feature a match opportunity containing the Company logo and additional recognition of the Project Power Strategic Partnership across all channels. The match goal is typically $100,000. Each e-mail is sent to a group of, approximately, 1,000,000 people.

**End of Year Giving (Year 1-3)**

Our EOY campaign typically runs just after Christmas through 12/31. It's a similar structure to Giving Tuesday and features approximately six e-mails over the course of one week, a lightbox on the homepage, paid advertising (Google, Bing, Facebook), social posts (national and local), and either a dedicated donation form or an altering of our main form. We feature a match opportunity which would contain Company logo and additional recognition of the Project Power Strategic Partnership across all channels. The match goal is typically $300,000. Each e-mail is sent to a group of, approximately, 1,000,000 people.

**Local Activation (Year 2-3)**

$500,000 of this investment will be allocated to Local Activation in the PODs of the ADA and managed by the National Relationship Managers of the American Diabetes Association.

**Use of Association Content**

Company receives the opportunity to use Association diabetes-related, consumer content for the purpose of developing branded materials in support of the Project Power Strategic Partnership.

All Association content shall remain the property of the Association and all Company content shall remain the property of Company. The parties shall mutually agree on the content, use and distribution of co-branded pieces.  Further, all co-branded materials developed as part of this sponsorship shall be exclusive to the sponsorship for the Term and subject to advance review and approval by the Parties. Upon conclusion of the Term, neither party shall use the co-branded materials without the written approval of the other party.

**<u>Company Engagement in Support of ADA</u>**

Company agrees to work collaboratively with the ADA to identify in-kind public relations and promotional opportunities to support its Project Power Strategic Partnership which may include, but is not limited to the following benefits:

- Develop Company press release announcing relationship. ADA shall provide appropriate quote.

- Develop social media posts, typically 2x in each 12-month period during the Terms including a call to action to engage with Company social media about diabetes
- Company shall post a total of 12 social media posts during the Term, where the focus will center on the Project Power campaign with any other agreed upon content and provide a link to ADA and Company channels. Association shall engage with posts as deemed appropriate. A schedule determining the dates and social media activity shall be mutually agreed to by the parties.
- Create awareness of the relationship by featuring the Project Power logo, along with a call-to-action directing consumers to Company digital hub/Company diabetes web page that includes an opportunity to promote Project Power campaign activities

Encouraging employees and customers to participate in the Project Power Campaign, in various activations including but not limited to ***American Diabetes Month, Giving Tuesday, Project Power Events, and the Diabetes Risk Test***

**<u>Data Collection and Evaluation</u>**
1. Reach and engagement
   a. ADA marketing and engagement team to track engagement with digital resources and email campaigns deployed
   b. ADA IT&S team to capture ADA Risk Test metrics for the number of people who take the ADA Risk Test
   c. Project Health data to be collected by Company to track the number of people who participate in health screening, number of employees trained, and resources distributed in-store/at the pharmacy
   d. Project Power members to capture metrics on number of participants who enroll and complete the program
2. Impact
   a. ADA program evaluation team to disseminate pre/post surveys to engaged participants to assess impact on resource awareness and follow-up with health care providers upon receiving Risk Test and health screening results
      i. Work with select sites to conduct in-depth pilot testing to assess for health screening impact
   b. Project Power pre/post surveys to assess change in awareness, behaviors, and intentions among participants to assess impact on health and wellness
3. Satisfaction
   a. Surveys to be distributed to health screening attendees, Project Power participants, and researchers to assess for satisfaction and gauge areas for programmatic enhancements

**<u>Project Governance:</u>** As the Project Power Strategic Partner, Company will be able to work with the ADA to operationalize elements of the strategies above. ADA will:
- Kick off the program with a joint working session to align on targets and baseline metrics
- Assign a Program Director to lead the execution of Statement of Work

- Produce quarterly reports on project metrics and results
- Produce annual reports on project metrics and results
- Meet with Company project leadership quarterly to review results, address opportunities, and review future plans
- Meet with Company executive leadership annually to review relationship, results, and opportunities

## Exclusivity and Positioning

The Exclusivity Period shall commence as of the Effective Date and will continue until the earlier of expiration of the term or termination of the Agreement. During the Exclusivity Period, Company will be designated as the exclusive sponsor of the Project Power Campaign in the national retail pharmacy category (by way of example, "national retail pharmacy" includes pharmacies such as Rite Aid, Walgreens, Fred's, Kroger and Walmart, but is not intended to include small regional chains or local, smaller independent pharmacies), meaning that ADA (including its local affiliate offices) will not enter into a sponsor agreement of the Project Power Campaign, with another company in this category without Company's prior written consent. The foregoing shall not apply to pre-existing, current and enforceable agreements as identified by ADA and reported to Company in writing prior to the Effective Date.

## Sponsorship Fee & Payment

Company will offer opportunities to its customers to make a donation to the ADA. Company commits to raise for the ADA a minimum of $10,000,000 for the Term of this Agreement.  The Company agrees to make annual payments of funds raised during each calendar year of this Agreement by December 31, beginning in 2021, as set forth below.

In the event the total funds raised through in-store fundraising and cause marketing and donated to the ADA from the Effective Date through December 31, 2023 total less than $10,000,000, Company agrees to either (i) donate funds to the ADA equal to the difference in the funds donated and $10,000,000, or (ii) Company may, in its sole discretion, elect to conduct additional consumer campaigns prior to April [xx], 2024.  Should a difference still remain due after the additional consumer campaigns, if any, are completed, Company agrees to donate funds to the ADA equal to the difference between the total funds donated and $10,000,000.  Any amounts raised over $10,000,000 minimum will be donated to the ADA as well.

**Payment Due: December 31, 2021**: Funds raised during 2021 consumer campaign
**Payment Due: December 31, 2022:** Funds raised during 2022 consumer campaign
**Payment Due: December 31**, **2023:** Funds raised during 2023 consumer campaign.
**Final Payment Due:** April 30, 2024: Funds raised from any additional consumer campaigns plus, in the event that the total funds raised is less than $10,000,000, an amount equal to the difference between the total funds raised and $10,000,000.

# Attachment B

## Use of ADA Marks

**Use of the ADA Marks**

Any use of the ADA Marks requires the review and written approval of the ADA as set forth in this Agreement and outlined in Attachment A: <u>Use of Intellectual Property</u>. Any modification to taglines or to the "lock-up" imagery, except with respect to sizing, shall also require review and written approval by the ADA to ensure that with any modification, there is prominent proximity between the brands.

Use the Marks as illustrated below without any modification.

**ADA MARKS**

ADA Marks shall be delivered within 14 days upon completion of a the fully executed Agreement

**A Proud Supporter of**



**A Project Power Strategic Partner of**



**COMPANY MARKS**







# EXHIBIT "B"

**Amendment to Corporate Sponsorship Agreement**

# Amendment to Corporate Sponsorship Agreement

This Amendment, dated as of October 28, 2021 (the "Amendment Effective Date") amends the Corporate Sponsorship Agreement effective April 13, 2021 (the "Agreement") between the American Diabetes Association, an Ohio non-profit corporation with its principal office located at 2451 Crystal Drive, Suite 900, Arlington, VA 22202 ("ADA") and CVS Pharmacy, Inc., a Rhode Island corporation, located at One CVS Drive, Woonsocket, Rhode Island 02895 ("Company"). ADA and Company are sometimes individually referred to herein as the "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

WHEREAS, the Parties seek to modify the Agreement to clarify that the Company may direct any funds raised in excess of $10,000,000 in the three-year period to support other initiatives at the Company's discretion, so long as such other initiatives advance the ADA's mission; and

WHEREAS, pursuant to Section 24 of the Agreement, the Parties to the Agreement wish to make an amendment to the Agreement and have agreed to consent to such amendment to the Agreement, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. **Amendment.** Effective as of the Amendment Effective Date, Attachment A to the Agreement is hereby amended to include the following paragraph after the second paragraph of the section entitled "Sponsorship Fee & Payment":

"The Company may direct any funds raised in excess of $10,000,000 over the Term of the Agreement to support other initiatives at the Company's discretion, so long as such other initiatives advance the ADA's mission. Such direction shall be provided in writing by the Company to the ADA and shall be subject to the approval of the ADA, such approval not to be unreasonably withheld."

2. **Integration.** The Agreement, as amended by this Amendment, constitutes the entire agreement between the Parties hereto relating to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no general or specific warranties, representations or other agreements by or among the Parties in connection with the entering into of the Agreement or the subject matter hereof except as specifically set forth or contemplated herein.

3. **Governing Law.** This Agreement is subject to and shall be construed in accordance with the laws of the Commonwealth of Virginia and jurisdiction and venue shall be solely in the federal and state courts situated in the City of Alexandria or Arlington County. If any terms of this Agreement are invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule or law, such term shall be deemed reformed or deleted only to the extent necessary to comply with such statute, regulation, ordinance order or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

4. **Execution in Counterparts.** This Amendment may be executed by the Parties in any number of counterparts, and by each of the Parties in separate counterparts, each of which counterparts, when

so executed and delivered, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Amendment in Portable Document Format (PDF) or by facsimile transmission shall be as effective as delivery of a manually executed original counterpart of this Amendment. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

Except as expressly set forth herein, this Amendment shall not alter, modify, amend or in any way affect the terms, conditions, obligations, covenants or agreements contained in the Agreement, all of which are ratified and affirmed in all respects and shall continue in full force and effect.

The parties hereto have executed this Amendment effective as of the date first written above.

**AMERICAN DIABETES ASSOCIATION**  **CVS PHARMACY, INC.**

| By: _Charles D. Henderson Jr._ <br> 8218D85A496D4A6... | By: _Eileen Boone_ <br> 661285B1AFDC4EB... |
|---|---|
| Name: <br> **Charles Henderson** | Name: <br> **Eileen Howard Boone** |
| Title: <br> **Chief Development Officer** | Title: <br> **SVP, Corporate Social Responsibility & Philanthropy** |
| Date: <br> 10/28/2021 | Date: <br> 10/28/2021 |
| By: _Charlotte M. Carter_ <br> C1148642B39446E... | |
| Name: <br> **Charlotte M. Carter** | |
| Title: <br> **Chief Financial Officer** | |
| Date: <br> 10/28/2021 | |

# EXHIBIT "C"

***CVS Health announces $10 million commitment to the American Diabetes Association to reach five million patients and transform health outcomes***

## November 2, 2021

www.cvshealth.com/news-and-insights/press-releases/cvs-health-announces-10-million-commitment-to-the-american
(last checked Sept. 12, 2022)



# CVS Health announces $10 million commitment to the American Diabetes Association to reach five million patients and transform health outcomes



Tuesday, November 2, 2021

*Support will increase access for people with diabetes and caregivers to education, resources, and guidance to improve their overall health*

WOONSOCKET, R.I. — CVS Health (NYSE: CVS) today announced a new partnership with the American Diabetes Association® (ADA) to support families in helping to prevent and manage diabetes, as well as fund research on the devastating health disparities that fuel the diabetes epidemic. CVS Health has committed $10 million over three years to support people in preventing and managing diabetes with increased awareness, knowledge, and action to improve health through Project Power. The ADA's Project Power program aims to break down barriers that limit access to vital resources and empower participants to effectively prevent and manage diabetes.

In addition, support will fund research to better understand and address the unmet needs in underserved communities leading to the future elimination of these disparities. CVS Health will also host an in-store fundraising campaign at all CVS Pharmacy locations nationwide during American Diabetes Month, now through November 27, to give customers an opportunity to support the ADA and build a future without diabetes.

"Health inequity is real—it directly fuels childhood obesity and contributes to higher risk and worse outcomes for people with diabetes, a reality that has been exacerbated by the COVID-19 pandemic," said Charles Henderson, Chief of Development Officer of the American Diabetes Association. "By funding much-needed research to help tear down systemic barriers and providing critical resources, we can empower people of color who live with diabetes to take control of their health and live better, fuller lives."

The need for engagement and education on the problem of childhood obesity has never been more urgent. New data from the ADA shows that the incidence and acuity of type 2 diabetes in children increased significantly, close to doubling, during the peak of the COVID-19 pandemic. More pediatric patients were hospitalized from March to December 2020 compared to the same period in 2019.



"Over the past 18 months, we've seen COVID-19 bring health disparities to the forefront, shedding additional light on the barriers to care that families across the country face every day," said Eileen Howard Boone, Senior Vice President of Corporate Social Responsibility and Philanthropy for CVS Health, and President of the CVS Health Foundation. "CVS Health is committed to addressing the disparities resulting from social determinants like race, ethnicity, lack of access, and cost. Through our partnership with the American Diabetes Association, we will help increase access to health care among high-risk and vulnerable populations and provide them with the educational resources they need to stay healthy."

A primary focus of Project Power will be to encourage adults to take control of their diabetes and to raise awareness among the 88 million Americans living with prediabetes through risk tests and health screenings.

To learn more about the partnership and access diabetes resources, visit cvs.com/diabetes.

## About CVS Health

CVS Health is the leading health solutions company, delivering care like no one else can. We reach more people and improve the health of communities across America through our local presence, digital channels and over 300,000 dedicated colleagues – including more than 40,000 physicians, pharmacists, nurses, and nurse practitioners. Wherever and whenever people need us, we help them with their health – whether that's managing chronic diseases, staying compliant with their medications, or accessing affordable health and wellness services in the most convenient ways. We help people navigate the health care system – and their personal health care – by improving access, lowering costs and being a trusted partner for every meaningful moment of health. And we do it all with heart, each and every day. Learn more at www.cvshealth.com.

**About the American Diabetes Association**
Every day more than 4,000 people are newly diagnosed with diabetes in America. More than 122 million Americans have diabetes or prediabetes and are striving to manage their lives while living with the disease. The American Diabetes Association (ADA) is the nation's leading voluntary health organization fighting to bend the curve on the diabetes epidemic and help people living with diabetes thrive. For 81 years the ADA has been driving discovery and research to treat, manage and prevent diabetes, while working relentlessly for a cure. We help people with diabetes thrive by fighting for their rights and developing programs, advocacy and education designed to improve their quality of life. Diabetes has brought us together. What we do next will make us Connected for Life. To learn more or to get involved, visit us at diabetes.org or call 1-800-DIABETES (1-800-342-2383). Join the fight with us on Facebook (American Diabetes Association), Twitter (@AmDiabetesAssn) and Instagram (@AmDiabetesAssn).

**Media contact:**
Eva Pereira
781-686-4200
PereiraE1@cvshealth.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document is being filed electronically on September 20, 2023, via the Court's electronic-case-filing (ECF) system. Notice of this filing will be sent by the Court's ECF system to all parties, and copies will be mailed to those parties, if any, that are not served in such manner.

Dated: September 20, 2023

*s/ Todd C. Bank*
Todd C. Bank